Kenneth G. PAVEL, Petitioner–
Appellant,

v.

Melvin L. HOLLINS, Superintendent,
Oneida Correctional Facility; Eliot L.
Spitzer, Attorney General of New
York State, Respondents–Appellees.

Docket No. 99–2410.

United States Court of Appeals,
Second Circuit.

Argued April 4, 2001.

Fully Submitted May 3, 2001.

Decided July 25, 2001.

James V. O'Gara (Kevin C. Walker, of
counsel), Kelley Drye & Warren, LLP,
New York, NY, for appellant.

Marlene O. Tuczinski, Assistant Solicitor General (Nancy A. Spiegel, Assistant Solicitor General, Peter H. Schiff, Senior Counsel, of counsel; Eliot Spitzer, Attorney General of the State of New York, on the brief), Office of the Solicitor General of the State of New York, for appellees.

Before: KEARSE and CABRANES, Circuit Judges, and TRAGER, District Judge.*

JOSÉ A. CABRANES, Circuit Judge:

Petitioner-appellant Kenneth G. Pavel ("Pavel") has been held for more than ten years pursuant to a state court judgment of conviction in the custody of state correctional authorities, most recently that of Respondent Appellee Melvin L. Hollins, Superintendent of the Oneida Correctional Facility. Over five years ago, on February 7, 1995, Pavel petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Northern District of New York (Thomas J. McAvoy, then-*Chief Judge*). Pavel argued that the state court judgment of conviction was entered in violation of his rights under the Sixth Amendment to the United States Constitution because his trial attorney provided him with ineffective assistance. Pavel's petition was denied, and judgment was entered accordingly.

On appeal, Pavel emphasizes that his trial attorney (1) did not prepare a defense, on the theory that the charges against Pavel would be dismissed at the close of the prosecution's case; (2) failed to call two important fact witnesses, with the content of whose putative testimony the

attorney was familiar; and (3) did not call as a witness a medical expert. In these circumstances, Pavel argues, his right to effective assistance of counsel was violated.

We agree. Accordingly, we reverse the judgment of the District Court, vacate the state court judgment of conviction, and remand the cause. On remand, the District Court shall issue a writ of habeas corpus to Mr. Pavel on the thirtieth calendar day after the issuance of our mandate unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry him.

## I. BACKGROUND

In the spring of 1989, Pavel was arrested and accused of sexually abusing his children—Matthew Pavel ("Matthew"), then age seven, and David Pavel ("David"), then age five (collectively, "the boys"). The accusations were brought to the attention of the police by Pavel's then-wife, Margaret Pavel ("Ms.Pavel"), with whom he was engaged in a series of marital disputes, and who had recently been denied sole custody over Matthew and David.

Upon his arrest, Pavel contacted Sanford Meltzer ("Meltzer"), the attorney who had represented him in connection with the marital disputes. Meltzer noted that there was little if any physical evidence that Pavel had sexually abused the boys in the manner that they alleged.[1] Accordingly, Meltzer did not prepare a defense; instead, he planned to move to dismiss the charges against Pavel at the close of the prosecution's presentation of its evidence,

---

* The Honorable David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

1. The boys were examined by a medical doctor soon after Pavel was arrested. They testified that they had been anally sodomized once

a week for four months, and more frequently in the twelve or so days prior to their physical examinations. But Matthew's examination showed no relevant physical abnormality, and David's examination revealed only mild redness in his anal area. *See post* I.B.

and was confident that the trial judge would grant the motion.[2]

Pavel pleaded not guilty, a bench trial commenced, and at the close of the prosecution's evidence, Meltzer moved to dismiss the charges against Pavel. In relevant part, the motion was denied.

Meltzer, as noted, had not prepared for this eventuality. Accordingly, he had little choice—he put Pavel on the stand, and then rested without calling any other witnesses.[3]

On October 18, 1989, the state trial judge found Pavel guilty of some of the charged crimes and, on November 27, 1989, held a sentencing hearing, at which Pavel contended that he was innocent. Pavel was sentenced principally to two consecutive 4–12 year terms of incarceration, and was remanded to prison.

Pavel was paroled almost nine years later—on August 25, 1998. One of the conditions of his parole was that Pavel "cooperate fully" with a particular sex-offender program. As part of the program, Pavel was required to admit having committed the crimes for which he was convicted. He refused to do so, see PAVEL AFFIDAVIT (executed April 20, 2001) at ¶ 4 ("Because I did not commit the acts of which I was convicted, I have steadfastly refused to admit to them."), and was therefore returned to prison on November 15, 1999. He is there now.

Before assessing Pavel's Sixth Amendment claim, we pause briefly to provide a fuller account of the procedural history of this case, and of the evidence presented at trial.

## A. RELEVANT PROCEDURAL HISTORY

As noted above, following a bench trial in Onondaga County Court, New York (John W. Brandt, *Judge*), Pavel was convicted on October 18, 1989 of sodomizing, sexually abusing, and endangering the welfare of his children. A judgment of conviction was entered, and within one calendar year, the state's direct-appeals process had run its course: The judgment was affirmed by the Appellate Division, Fourth Department, see *People v. Pavel,* 163 A.D.2d 834, 558 N.Y.S.2d 369 (1990), and leave to appeal was denied by a Judge of the New York Court of Appeals, see *People v. Pavel,* 76 N.Y.2d 862, 560 N.Y.S.2d 1002, 561 N.E.2d 902 (1990).

On July 27, 1992, in Onondaga County Court, Pavel moved pursuant to New York Criminal Procedure Law § 440.10(1)[4] to

---

**2.** In a June 15, 1995 affidavit submitted in connection with the habeas corpus petition filed by Pavel's new counsel, Meltzer explained:

> Prior to the trial of the criminal case against Mr. Pavel, I concluded that the State's case was without merit because I felt that the medical evidence was insufficient to sustain a conviction. As a result, I did not prepare a defense for Mr. Pavel, believing instead that a motion to dismiss the State's case at the close of its evidence in chief would be granted by the Court.

**3.** In his summation, Meltzer argued that Ms. Pavel had "coached" the boys and "manipulated" them into accusing their father of sexual abuse so that she could obtain sole custody over them. In support of this theory, Meltzer

noted that both boys repeatedly described their father's alleged sexual abuse using the same phrase—"he put his peeny in our brown spot"—and that seven-year old Matthew defined a "peeny" in surprisingly formal terms, as "hav[ing] a scrotum."

**4.** New York Criminal Procedure Law § 440.10(1) (" § 440.10") reads in pertinent part as follows:

> **§ 440.10 Motion to vacate judgment**
> 1. At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that:
> . . .
> (h) The judgment was obtained in violation of a right of the defendant under the constitution of . . . the United States.

vacate the judgment of conviction ("the § 440.10 motion"). One of the bases of the § 440.10 motion was Pavel's claim that Meltzer had provided him with ineffective assistance of counsel. After oral argument, at which Pavel was represented by Jeffrey S. Cook and James V. O'Gara of the New York law firm of Kelley Drye & Warren, the § 440.10 motion was denied. Leave to appeal from the denial was itself denied on April 1, 1993 by a Judge of the Appellate Division, Fourth Department.

On February 7, 1995, Pavel petitioned for a writ of habeas corpus in the District Court, arguing, *inter alia*, that Meltzer had provided ineffective assistance of counsel. The petition was denied as procedurally barred, and judgment was entered accordingly on August 16, 1996. Pavel then applied for a Certificate of Appealability, and his application was denied in a December 23, 1996 Decision and Order entered by Judge McAvoy.

Approximately one month later, Pavel moved this Court for a Certificate of Appealability. We ruled by summary order that Pavel's claims were not procedurally barred and remanded the cause to the District Court, by mandate entered July 10, 1997, for a determination of the petition on the merits.

On June 16, 1999, Judge McAvoy again dismissed Pavel's habeas petition, this time on the merits, and on July 20, 1999, he denied for a second time Pavel's motion for a Certificate of Appealability.

On October 19, 1999, Pavel moved in the Court of Appeals for another Certificate of Appealability. By order dated July 24, 2000, we granted the motion on the question of whether "appellant [Pavel] was denied effective assistance of trial counsel if, as he alleges, his counsel, assuming that his motion to dismiss would be granted, failed to prepare a defense."

That is the question now before us.

## B. TRIAL EVIDENCE

The prosecution's evidence at trial consisted principally of the testimony of five witnesses, which we summarize briefly here.

Section 440.10 is "designed to ... embrace all extant non-appellate post-judgment remedies and motions to challenge the validity of a judgment of conviction," 11A PETER PREISER, MCKINNEY'S CONSOLIDATED LAWS OF NEW YORK, CRIMINAL PROCEDURE LAW 424 (1994), the most prominent of which in this century has been the writ of error *coram nobis, see generally* Stanley Fuld, *The Writ of Error Coram Nobis,* 117 N.Y. L.J. 2212 (June 5, 1947). Although it codifies common law collateral remedies, § 440.10 does not wholly displace them, *see, e.g., People v. Bachert,* 69 N.Y.2d 593, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987) ("[T]he Legislature did not expressly abolish the common-law writ of *coram nobis* or necessarily embrace all of its prior or unanticipated functions within [§ 440.10.]"), and it does not encompass habeas corpus and certiorari remedies. *See* N.Y. CIVIL PRACTICE LAW AND RULES, §§ 7001–7012 (McKinney 1998) (describing these remedies). One leading commentator has summarized the basic differences between a § 440.10 motion and habeas corpus as follows:

> A [§ 440.10 motion] must be brought in the court where the defendant was convicted and, unlike state habeas corpus, cannot be brought in the court of another county where the defendant happens to be detained. But of the eight grounds for the [§ 440.10] motion to vacate judgment, the only one common to both that motion and state habeas corpus is lack of trial jurisdiction of the action that resulted in the conviction or lack of jurisdiction of the person of the defendant. The other grounds for the motion to vacate judgment do not qualify for habeas corpus, because the only immediate relief that could be granted on those grounds is a new trial or a new appeal; as distinguished from immediate release from custody, which is the basis for a writ of habeas corpus.

11A PREISER, *supra,* at 424–25 (citations omitted).

First, seven-year old Matthew testified under oath that Pavel had anally sodomized him every Saturday during the four months from December 1988 until mid-April 1989. Matthew testified also that he and David spent a week-long vacation, from Saturday, April 15, 1989 until Saturday, April 22, 1989, with Pavel, at the Florida apartment of Clothilde Pavel, Pavel's mother and the boys' grandmother. Matthew testified that he was anally sodomized at least twice during that trip—at least one of the incidents, Matthew testified, took place in Clothilde Pavel's bathroom, while she was making breakfast.[5] Following the trip, Matthew testified, he and David told Ms. Pavel, their mother, about Pavel's alleged sodomizing of them. The police were informed of the accusations; five days after returning from Florida, Matthew and David were given physical examinations, and Pavel was arrested. Matthew then spoke with a therapist named Constance McKinstry ("Ms.McKinstry") and the prosecutor about Pavel's alleged sex abuse.

Second, five-year old David testified as an unsworn witness. His testimony was, as might be expected, frequently non-responsive or confused.[6] But some of David's testimony was clear; David testified unambiguously that he was anally sodomized at least three times during the 12 days before he was examined by a doctor in connection with the charges against Pavel, and that one of those episodes took place in the bathroom of the Florida apartment. At one point in his testimony, David strongly suggested that he was so-

domized *three times a day* during the Florida trip. The prosecutor asked the following question: "You said it happened in Florida too. Do you remember how many times it happened in Florida?" David answered: "When we had lunch, breakfast and dinner."

Third, Ms. McKinstry, who is not a licensed psychologist, testified that when she first began meeting with the boys on March 14, 1989, she believed that they suffered from "[a]djustment disorder with anxious mood." Ms. McKinstry testified that she began to suspect "the possibility" that they were being sexually abused in mid-April of 1989, when Matthew, during therapy sessions, began hitting a three and a half foot tall yellow dummy on a label located in the dummy's genital area. Thereafter, Ms. McKinstry testified, Matthew and David talked with her during their weekly therapy sessions about Pavel's sexual abuse. Ms. McKinstry did not discuss the boys' allegations with Pavel.

Fourth, Ms. Pavel testified that, on the day the boys returned from Florida, Matthew began singing songs about his "peeny" when she was giving the boys a bath. Matthew's singing, Ms. Pavel testified, prompted a series of questions and a conversation in which the boys described Pavel's alleged sexual abuse.

Fifth, the prosecution called a medical expert, Dr. Celeste Madden ("Dr.Madden"). Dr. Madden testified that she reviewed the records of the physical examination of the boys that had been conducted on April 27, 1989, five days

---

**5.** At one point, Matthew testified that Pavel anally sodomized him in New York on the morning that Pavel picked the boys up to take them to Florida. At another point, Matthew testified that no such sodomy occurred.

**6.** The following colloquy is representative:

 Q: When did [Pavel's abuse] start, David?

 A: I don't know.
 Q: When did it stop, David?
 A: I don't know either.
 Q: How many times did it happen, David?
 A: (No response.)
 Q: Do you have an answer for me, David?
 A: I don't know.

after they returned from Florida. She did not examine the boys herself. Dr. Madden observed that the records of the physical examination of Matthew showed no relevant physical abnormalities, while the records of David's physical examination indicated only that he had "mild perianal arrythmia," which Dr. Madden described as "discoloration of the skin, redness around the anal area." Dr. Madden testified that it was "possible" that diarrhea could cause such "redness." She testified also that David's "discoloration" was "consistent" with his account of sexual abuse, and that Matthew might have been anally sodomized as he described without any physical indication of the sodomy remaining after the fact.

At the close of the prosecution's case, Pavel testified in his own defense. His testimony consisted almost entirely of denials of the boys' accusations. In addition, Pavel referred briefly to David's having diarrhea during the Florida visit with Clothilde Pavel:

Q: ... Did either child become ill on the trip to Florida?

A: Matthew had a cough and sore throat while we were down in Florida and David also had diarrhea at least one day that we were down there, yes.

Q: And did that take care of itself?

A: It seemed to work itself out, yes.

## II. DISCUSSION

### A. STANDARD OF REVIEW

■ We review *de novo* the District Court's denial of Pavel's petition for a writ of habeas corpus. *See, e.g., Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001).

■ Similarly, we owe no deference to the state courts' determination that the judgment of conviction was not entered in violation of Pavel's federal right to effective assistance of counsel. The federal habeas corpus statute was amended in 1996 by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. Law No. 104–132, 110 Stat. 1214. Pursuant to AEDPA, a federal habeas court assessing a state prisoner's federal claim must defer in some circumstances to a state court judgment that denied the claim "on the merits." 28 U.S.C. § 2254(d) (" § 2254(d)"). However, because the habeas petition now before us was filed before AEDPA's effective date of April 24, 1996, § 2254(d) has no bearing on this case, and we review the petition under the standards dictated by "pre-AEDPA law." *See Slack v. McDaniel,* 529 U.S. 473, 482, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Under those standards, pure questions of law are reviewed *de novo,* as are mixed questions of law and fact, *see, e.g., Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); state court factual findings are "presumed ... correct" absent certain circumstances, *see* 28 U.S.C. § 2254(d) (1994) (enumerating these circumstances). In this case, there are no relevant state court factual findings. Accordingly, there is no basis under "pre-AEDPA law" for deferring to the state courts' denial of Pavel's Sixth Amendment claim.

### B. CONSTITUTIONAL PRINCIPLES

As noted above, Pavel contends that he was convicted in state court in violation of the Sixth Amendment to the United States Constitution, which vests persons charged with crimes with the right to "the Assistance of Counsel." U.S. CONST. amend. VI. The right to "Assistance of Counsel" encompasses the right to *effective* "Assistance of Counsel," *see, e.g., McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and applies to the states as a component of the

right to "due process of law" secured by the Fourteenth Amendment to the United States Constitution, *see Evitts v. Lucey,* 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

■ To establish that he was convicted in violation of his right to effective assistance of counsel, a claimant must satisfy both prongs of the two-part test articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test is "rigorous," *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001), and "highly demanding," *Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To satisfy it, a claimant must show both that "counsel's performance was deficient" *and* "that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

As to the first prong, to determine whether an attorney's conduct was deficient, "[t]he court must … determine whether, in light of all the circumstances, the identified acts or omissions were outside the *wide* range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052 (emphasis added). As to the second prong, to establish that he was "prejudiced" by his attorney's constitutionally deficient performance, a claimant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" in this context is one that "undermine[s] confidence in the outcome." *Id.*

We consider each of these prongs in turn.

## C. ANALYSIS

### 1. MELTZER'S PERFORMANCE

Pavel claims that Meltzer's representation of him was unprofessional to the point of being constitutionally "deficient." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. We agree.

■ As discussed below, Meltzer's representation of Pavel was flawed in three distinct ways. Because we conclude, that the *cumulative* weight of these flaws deprived Pavel of his Sixth Amendment rights, *see post* at 225, *see, e.g., Lindstadt,* 239 F.3d at 199 (holding that for Sixth Amendment purposes attorney errors must be considered "in the aggregate"), we do not consider whether *some* of these flaws—standing alone, or in combination with one another—could adequately support our conclusion that Meltzer's representation of Pavel was constitutionally deficient.

### a. FAILURE TO PREPARE A DEFENSE

First, Meltzer decided not to prepare a defense for Pavel solely because he was confident that, at the close of the prosecution's presentation of its evidence, the trial judge would grant Meltzer's motion to dismiss the government's charges against Pavel. That Meltzer opted not to prepare a defense based entirely on this rationale militates strongly in favor of the conclusion that his representation of Pavel was constitutionally deficient.[7] *See Harris v. Reed,* 894 F.2d 871, 878–79 (7th Cir.1990); *United States ex rel. Cosey v. Wolff,* 562 F.Supp. 140, 143–46 (N.D.Ill.1983), *aff'd in relevant part on opinion below by United*

---

**7.** Our inquiry into Meltzer's performance is not at an end simply because his decision not to prepare a defense, or to put on any witnesses other than Pavel, was not, in fact, based on strategic considerations. *See, e.g., Kimmelman,* 477 U.S. at 385, 106 S.Ct. 2574 (holding (1) that counsel did not in fact take

certain actions because of strategic considerations and (2) *then* conducting a *Strickland* analysis—that is, then determining whether failure to take the relevant actions was "contrary to prevailing professional norms"). *See post* at 217–19.

States ex rel. Cosey v. Wolff, 727 F.2d 656 (7th Cir.1984), *overruled on other grounds by United States v. Payne*, 741 F.2d 887, 891 n. 4 (7th Cir.1984); *see also Osborn v. Shillinger*, 861 F.2d 612, 626 (10th Cir. 1988) (holding that an attorney's performance was deficient under *Strickland*'s first prong where, *inter alia*, the attorney failed to prepare for state court "death penalty phase" proceedings because he believed that he could convince the prosecutor not to seek the death penalty); *Blake v. Kemp*, 758 F.2d 523, 535 (11th Cir.1985) (Elbert P. Tuttle, *Judge*) (holding that an attorney's performance was deficient under *Strickland*'s first prong where, *inter alia*, the attorney failed to prepare for state post-conviction proceedings because he believed that his client would not be convicted); *cf. Jackson v. Calderon*, 211 F.3d 1148, 1161–62 (9th Cir.2000); *Sneed v. Smith*, 670 F.2d 1348, 1354 (4th Cir. 1982); *Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir.1972).

### b. FAILURE TO CALL IMPORTANT FACTS WITNESSES

Next, Pavel notes that Meltzer decided not to call two fact witnesses—Clothilde

Pavel and Dr. Ralph Berry III ("Dr.Berry")—with whose putative testimony he was familiar before the trial began.[8] Pavel contends that this decision was an extraordinarily poor one, and we agree.

Before explaining why, we pause briefly to note that Meltzer's decision not to call particular witnesses related to trial strategy, *see United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) ("[t]he decision not to call a particular witness is typically a question of trial strategy"), and that we have been especially hesitant to disturb such "strategic" decisions.[9] *See, e.g., id; Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir.1983). *See generally Strickland*, 466 U.S. at 690, 104 S.Ct. 2052 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

However, this hesitation to challenge a lawyer's "strategic" decisions has no place here. Meltzer stated that he opted not to prepare a defense—and not to call any witnesses other than Pavel—solely because he believed that the motion to dis-

---

**8.** Neither of these decisions was made by Meltzer at the behest of Pavel. Meltzer decided "unilaterally" not to call Clothilde Pavel or Dr. Berry, and he did not consult with Pavel regarding any matters of trial strategy.

**9.** This special reluctance is, *inter alia*, prophylactic. Although it is clear *ex ante* that, in most cases, an attorney can provide constitutionally adequate assistance to his client by pursuing any number of trial strategies, *see Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, strategic choices made by an attorney whose client ends up being convicted have a way of looking especially inadequate in the bright light of hindsight. *See Knott v. Mabry*, 671 F.2d 1208, 1212 (8th Cir.1982) ("Human nature is such that most people think they have a better understanding of the demands of an event after it has happened. Trial of law suits is peculiarly susceptible to hindsight appraisal

of another lawyer's endeavors."). But our focus in analyzing the performance prong of Sixth Amendment ineffective-assistance-of-counsel claims must be on the reasonableness of decisions when they were made, not on how reasonable those decisions seem in retrospect. *See, e.g., United States v. Bayless*, 201 F.3d 116, 130 (2d Cir.2000). Our articulated reluctance to hold that an attorney's strategic choices were constitutionally deficient helps to focus us on this imperative—it disciplines our analysis by serving as a useful counterbalance to the unconscious, inevitable impact of hindsight on our decision-making. *Cf. Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (establishing a "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" "[b]ecause of the difficulties inherent" in "eliminat[ing] the distorting effects of hindsight").

miss would be granted. It is apparent from this explanation that Meltzer's decision as to which witnesses to call was animated primarily by a desire to save himself labor—to avoid preparing a defense that might ultimately prove unnecessary.[10] Meltzer's decision not to call any witnesses other than Pavel was thus "strategic" in the sense that it related to a question of trial strategy—which witnesses to call. And it was "strategic" also in that it was taken by him to advance a particular goal.

That goal, however, was mainly avoiding work—not, as it should have been, serving Pavel's interests by providing him with reasonably effective representation. Therefore, although Meltzer's decision was "strategic" in *some* senses of the word, it was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated "strategic" and been especially reluctant to disturb.[11]

**10.** There is no suggestion in the record that Meltzer opted not to prepare a defense so that he could invest more energy in other aspects of his criminal representation of Pavel. Similarly, there is no indication that Meltzer decided not to put on any witnesses other than Pavel because he believed that pursuing such a course would serve Pavel's interests. *See, e.g., Lema v. United States,* 987 F.2d 48, 54 (1st Cir.1993) ("Where the prosecution's case is less than compelling . . . the risk of 'rocking the boat' may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony.") (citing *Johnson v. Lockhart,* 921 F.2d 796, 800 (8th Cir.1990)).

**11.** As to "conscious" decisions: See, for example, *Moore v. Johnson,* 194 F.3d 586, 610 (5th Cir.1999) (holding that a particular decision could not be labeled "strategic" where, *inter alia,* the attorney had "no idea" why the decision had been taken); *Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir.1998) (noting that a decision cannot be characterized as "strategic" where it was a result only of "confusion"); and *Loyd v. Whitley,* 977 F.2d 149, 158 & n. 22 (5th Cir.1992) (distinguishing between "strategic judgment calls" and "plain omissions") (collecting cases); and compare *United States v. Gray,* 878 F.2d 702, 712 (3d Cir.1989) ("counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence").

As to "reasonably informed" decisions: See, for example, *Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (noting that a decision based on a legal misunderstanding was not animated by "strategic calculation"); *Kimmelman,* 477 U.S. at 368, 106 S.Ct. 2574 (noting that a decision based on ignorance of relevant facts and "mistaken beliefs" was not based on "strategic considerations"); *Smith v. Stewart,* 189 F.3d 1004, 1010 (9th Cir.1999) (holding that an attorney's decision not to pursue certain evidence was not "strategic" where, *inter alia,* it was based on a lack of understanding of what constituted such evidence); and *Williams,* 59 F.3d at 680 ("[b]ecause of his ignorance, counsel was . . . unable . . . to make any strategic decision[ ]"); and compare *Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir.1984) (contrasting an attorney's "general polic[y]" of how to defend a case with "strategic decisions," which are "decisions based on the specific facts of a given case"). As noted, the Supreme Court has explained that "[s]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052; *see also post* n. 13. But "virtually unchallengeable" does not mean *wholly* unchallengeable, *see Phoenix v. Matesanz,* 233 F.3d 77, 82 n. 2 (1st Cir.2000), and decisions that are not reasonably informed have emphatically *not* been "made after thorough investigation of law and facts."

As to decisions made with an eye to helping a client: See, for example, *Moore,* 194 F.3d at 615 (describing a "strategic" decision as, *inter alia,* a decision "that . . . is expected . . . to yield some benefit or avoid some harm to the defense"); and *Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir.1985) (contrasting a "strategic[ ]" choice with an attorney's "abdicat[ing] his responsibility to advocate his client's cause") (internal quotation marks omitted).

Accordingly, the hesitation to disturb "strategic" decisions described above has no bearing on this case. There are many ways properly to assist a client. *See ante* n. 9. But making important decisions with no regard for a client's interests is not one of them. That much is perfectly clear without the benefit of hindsight. *See id.*

We turn now to an assessment of Meltzer's decision not to call either Clothilde Pavel or Dr. Berry.

### (i) Clothilde Pavel

Pavel, David, Matthew, and Clothilde Pavel spent a week at the Florida apartment of Clothilde Pavel just before Pavel was arrested; the boys testified that during that week they were sodomized by Pavel.

Pavel argues that Meltzer should have called Clothilde Pavel. We agree.

The record before the District Court showed that Clothilde Pavel explained that had she been called at trial, she would have testified as follows:

On Wednesday, April 19, 1989, we drove back to my apartment in Boynton Beach at the conclusion of our trip to Disneyworld. At the beginning of this 2–3 hour drive, David, the younger child, became extremely agitated because he needed to go to the bathroom. After searching along the road for a rest-stop we found an International House of Pancakes restaurant. Immediately after we pulled into the parking lot, and before [Pavel] could get out the door, David ran out of the car and into the restaurant. [Pavel] chased after him and they returned shortly thereafter at which point [Pavel] informed me that David had had trouble with his bowels and that his stomach was obviously very upset. At the time we thought nothing of it and attributed his upset stomach to the fact that he had eaten too much at breakfast

and lunch and had been badly frightened on the Space Mountain ride at Disneyworld.

This testimony would have been valuable to the defense. It would have tended to corroborate Pavel's testimony that Matthew had diarrhea during the Florida trip, *see ante* 215, thereby bolstering the defense's theory that there was a wholly innocent explanation (an upset stomach) for the *only* species of physical evidence (slight redness in David's anal area) that so much as suggested that either of the boys had been sexually abused in Florida in the manner that they described.

More importantly, in addition to her testimony about David's gastrointestinal difficulties, Clothilde Pavel would have testified that although Matthew stated that Pavel had sodomized him in the bathroom while she busied herself "cooking" breakfast, and David suggested that he was sexually abused in Florida during mealtimes—"lunch, breakfast and dinner"—she did not "cook" breakfast during the week in Florida. Rather, she noted, breakfast consisted of "cold cereals or other foods that required little or no preparation." Thus, Meltzer could have argued, with some force, that it would have been difficult to sodomize Matthew or David, unnoticed, in the relatively small apartment, and in the short time that it takes to pull together a breakfast of cold cereal, or one that otherwise requires "little or no preparation."

Clothilde Pavel stated also that it was "equally unlikely that the acts which were supposed to have occurred could have occurred while I was preparing any other meal as the two boys spent virtually all their time in front of the television set in the living room when we were not at the beach." And in a similar vein, although Matthew testified that he was sodomized

in the bathroom during breakfast-time, and David testified that he too was sexually abused in the bathroom, Clothilde Pavel stated that the boys were alone in the bathroom with Pavel only at night (when he helped them brush their teeth), and then only with the door open. Indeed, Clothilde Pavel stated she was "quite certain that Kenneth [Pavel] had no opportunity to abuse the boys at any time during their visit with me in Florida as the four of us literally spent all of our time together." [12]

If she had given this testimony, Clothilde Pavel would have served as something of an alibi witness for Pavel. Her testimony would have damaged the credibility of the boys' assertions that Pavel had sexually abused them as charged in the indictment. It would have suggested that Pavel could not have abused the boys in Florida, as they claimed, because Pavel was not in the right place (in the bathroom with the boys) at the right time (during breakfast, or even during other meals).

"[T]he Constitution does not oblige counsel to present each and every witness that is suggested to him." *United States v. Balzano,* 916 F.2d 1273, 1294 (7th Cir. 1990). But in light of the testimony that Clothilde Pavel would have offered—and in light of the fact that Meltzer knew of this testimony before trial—Meltzer's decision not to call Clothilde Pavel was an error of extraordinary magnitude.

First, there is simply no suggestion in the record that there was any reason not to put Clothilde Pavel on the stand, and "an attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it." *Griffin v. Warden,* 970 F.2d 1355, 1358 (4th Cir.1992) (internal quotation marks omitted) (collecting cases); *cf. Brecheen v. Reynolds,* 41 F.3d 1343, 1368 (10th Cir.1994) (similar).

And second, Meltzer's decision not to put Clothilde Pavel on the stand was based on an inadequate investigation. [13] As noted above, Meltzer was familiar with the basic contours of Clothilde Pavel's testimony before the trial—presumably because he had spoken about the matter with Pavel. But Meltzer never followed-up on what he learned of Clothilde Pavel's putative testimony *with Clothilde Pavel herself:* Meltzer never contacted her with regard to her putative testimony, and never inquired into whether she might be willing to testify on Pavel's behalf.

Meltzer should have done both things. It should have been obvious to Meltzer

---

**12.** Clothilde Pavel would have testified also that during their week in Florida she noticed "nothing out of the ordinary" and perceived no indications that sexual abuse was taking place. Indeed, Clothilde Pavel believed that the boys were in good spirits—upon their arrival in Florida, she stated that "[f]ar from being upset at the thought of spending time on vacation with their father, Matthew and David were extremely happy and energetic."

**13.** The Supreme Court has explained the relationship between an attorney's pre-trial investigation and the choices that he makes with regard to matters of trial strategy:

[S]trategic choices *made after thorough investigation of law and facts relevant to*

*plausible options* are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 (emphasis added).

from the outset that Pavel's trial—like many sex abuse trials—was going to be a so-called "credibility contest," in which the word of the defendant's alleged victims (David and Matthew) would be set against the word of the defendant (Pavel), and in which there would be no substantial circumstantial evidence. *See generally* Brian L. Schwalb, Note, *Child Abuse Trials and the Confrontation of Traumatized Witnesses: Defining "Confrontation" to Protect Both Children and Defendants*, 26 HARV. C.R.-C.L. L.REV. 185, 186 (1991) ("often it is only the child and the [alleged] abuser who know what transpired"). In such cases, it should be perfectly obvious that it will almost always be useful for defense counsel to speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes. Accordingly, when Meltzer learned before trial that Clothilde Pavel might well be such a witness, he should

have taken affirmative steps to discuss the case with her.[14] Meltzer should not have relied only on what he had learned from Pavel. *Cf. United States v. Moore*, 554 F.2d 1086, 1093 (D.C.Cir.1976) (stating that "counsel's anticipation of what a potential witness would say does not excuse the failure to find out," in the context of an attorney who failed to contact a particular witness because the attorney was confident as to what the witness would say). Rather, at the very least, Meltzer should have directly contacted Clothilde Pavel—to learn more about the testimony that she would have offered, and to determine whether she might serve as a suitable witness based, *inter alia*, on his assessment of her credibility. But Meltzer simply did not contact Clothilde Pavel. Indeed, there is no indication in the record that Meltzer conducted *any* substantial, affirmative investigation into Clothilde Pavel's potential testimony.[15]

**14.** *See Lindstadt*, 239 F.3d at 200–01 (collecting cases); *see also, e.g., Williams*, 59 F.3d at 681 (holding, in the context of a sex-abuse case that turned on a "credibility contest," that a defense attorney provided ineffective assistance where, *inter alia*, (1) he failed to investigate the home in which the alleged assault had taken place and did not interview its occupants, and (2) had he done so, "th[e] evidence would have indicated that ... the alleged assault could not have taken place as claimed") (internal quotation marks omitted); *Noble v. Kelly*, 89 F.Supp.2d 443, 463 (S.D.N.Y.2000) (holding that, in the absence of a strategic explanation, the failure to properly call an alibi witness constituted constitutionally ineffective counsel); *cf. Crisp*, 743 F.2d at 584 ("Though there may be instances when the decision not to contact a potential defense witness is justified, an attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid the defense should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics' ") (internal citations omitted).

**15.** As to the inadequacy of Meltzer's investigation, our recent decision in *Lindstadt v. Keane*

is instructive. In *Lindstadt*, a man was convicted in state court of sexually abusing his daughter; his defense was that he had not done so, and that his daughter was manipulated and coached by his wife, with whom he had been enmeshed in a custody dispute. The man subsequently applied for a writ of habeas corpus on a theory of ineffective assistance of counsel, and we granted the writ. Of the two "[more] compelling" errors made by trial counsel in that case, *Lindstadt*, 239 F.3d at 202, one was his failure to conduct an adequate pre-trial investigation. Because of this failure properly to investigate, the attorney did not notice that his client was not living in a particular house during the period in which he had allegedly lived there and sexually abused his daughter. We explained, in part, why this failure was important:

Counsel's errors prevented [the habeas petitioner] from offering something *akin to an alibi:* [the petitioner] was not living with his daughter in December 1985 [when he allegedly sexually abused her]. *Cf. Brown v. Myers*, 137 F.3d 1154, 1156–57 (9th Cir. 1998) (taking it as given that a failure to adequately investigate alibi claim or wit-

In sum, Meltzer knew, before the trial, that Clothilde Pavel would have provided useful testimony with regard to David's stomach troubles and, more importantly, would have provided non-cumulative testimony that was "akin to an alibi." *Lindstadt*, 239 F.3d at 200–01. In light of this knowledge, Meltzer's decision not to call Clothilde Pavel was flawed because it was not based on either a plausible strategic calculus or an adequate pre-trial investigation.

### (ii) Dr. Berry

As noted above, the defense's theory was that Pavel was not guilty of the charged crimes, and that Matthew and David were accusing Pavel of sexual abuse because they had been manipulated into doing so by their mother, Ms. Pavel, who wanted to gain custody of them. *See ante* n. 3.

If the factfinder—here, the state trial judge—were to accept this defense, he would have to accept as true an extraordinarily unflattering portrait of Ms. Pavel. But the only evidence presented at trial that supported such a view of Ms. Pavel was Pavel's general speculations about her character—speculations that were necessarily self-serving and that would inevitably be discounted as such by the judge. Meltzer's failure to introduce any evidence from a disinterested source in support of the theory that Ms. Pavel was manipulating the boys was a substantial gap in the defense's presentation. And, as Meltzer knew before trial, that gap could have been filled easily by calling Dr. Berry.

Dr. Berry was a psychiatrist and court-appointed mediator who conducted a number of counseling sessions in September and October of 1988 with Pavel and Ms. Pavel to help them resolve their custody dispute over the boys. Dr. Berry would have been prepared to testify at trial as follows:

> It ... appeared to me that the stress [Ms. Pavel] experienced as a result of the marital situation resulted in problems with [Ms. Pavel's] psychological functioning and memory. For example, [Ms. Pavel] would take very extreme positions regarding visitation and subsequently deny having taken those positions.
>
> Further, [Ms. Pavel] showed a historical distrust and dislike of men that negatively affected her judgment and sense of reality and resulted in paranoia. When disagreed with, [Ms. Pavel] showed a rapid propensity to accuse [Pavel] and me of colluding against her. [Ms. Pavel] also accused [Pavel] of marital rape although, when pressed, she admitted that she did not express to [Pavel] her disinterest or reluctance to engage in sexual relations with him.

This testimony would have buttressed Meltzer's argument that Ms. Pavel fabricated her trial testimony by implying that she was hostile to the accused. (Indeed, Dr. Berry's testimony would have suggested that Ms. Pavel's hostility to Pavel had previously manifested itself in seemingly unfounded claims that he was a sex abuser.)

It would have been within the discretion of the trial court to admit such evidence of Ms. Pavel's hostility, *see post* n. 21, and it should have been obvious to Meltzer that such evidence would have been useful to

---

nesses constitutes ineffective counsel); *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir.1994) (holding that a failure to adequately investigate alibi witnesses constitutes ineffective counsel); *Nealy v. Cabana,*

764 F.2d 1173, 1177–78 (5th Cir.1985) (same). . . .
*Lindstadt*, 239 F.3d at 200–01 (emphasis added).

the defense.[16] *See generally Lindstadt,* 239 F.3d at 203 (describing, in a similar context, the "exceeding importan[ce]" in a "credibility contest" of "the testimony of neutral, disinterested witnesses") (internal quotation marks omitted); *Crisp,* 743 F.2d at 585 (noting the importance of "[h]aving independent witnesses corroborate a defendant's story"). Meltzer's explanation for why he opted not to put Dr. Berry on the stand is inadequate, *see ante* at II.C.1.b, and on appeal respondents do not advert to any possible strategic consideration that could conceivably have counseled against having Dr. Berry testify. Meltzer's decision not to call Dr. Berry was therefore another factor that contributes to our conclusion that counsel's cumulative errors made his performance constitutionally deficient. *See, e.g., Hart v. Gomez,* 174 F.3d 1067, 1071 (9th Cir. 1999) (holding that counsel provided constitutionally ineffective assistance where, *inter alia,* "[h]aving chosen to pursue [a particular] line of defense," counsel did not introduce readily-available evidence that would have corroborated that line of defense, and there was no plausible strategic reason for his not introducing the evidence).

### c. FAILURE TO CALL A MEDICAL EXPERT

Finally, we believe that Meltzer's performance was deficient to the extent that he did not call a medical expert to testify as to the significance of the physical evidence presented by the prosecution. This decision might well have been beyond reproach if it had been based on appropriate strategic considerations, or if it had been made by Meltzer following a sufficient investigation. But that was not the case.

First, as noted above, Meltzer decided not to put on a medical expert for reasons that had nothing to do with serving Pavel's interests. *See ante* II.C.1.b. Therefore, the considerations that animated Meltzer's decision not to call a medical expert cannot be described as truly "strategic."

Second, Meltzer's decision not to call a medical expert was deficient because it was not based on pre-trial consultation with such an expert. *See generally ante* n. 13 (describing the relationship between pre-trial investigation and the propriety of decisions related to matters of trial strategy). Meltzer should have consulted an expert; as to why, *Lindstadt* is again relevant.

In that case, as noted above, *see ante* n. 15, a defendant was convicted of sexually abusing his daughter. The only physical evidence that the prosecution introduced was the testimony of a physician, who testified (1) that he observed some bumps, clefts, and scars in the alleged victim's vaginal area, and (2) that a "Boston study" and a "review" conducted by another physician established that there was a link between sexual abuse and the bumps, clefts, and scars. The defense attorney failed to obtain either the "Boston study" or the "review," and he failed to consult

---

**16.** Indeed, it is clear that Meltzer believed that the evidence would have been useful. During his cross-examination, Meltzer attempted but repeatedly failed to elicit from Ms. Pavel evidence that Dr. Berry would have provided had Dr. Berry been asked to testify. For example, Meltzer knew that Dr. Berry would have testified that "Margaret showed a historical distrust and dislike of men that negatively affected her judgment and sense of reality and resulted in paranoia." Presumably hoping to introduce such information into evidence, Meltzer asked the following question: "M[ ]s. Pavel, did you tell Dr. Berry that men are out to get you?" Similarly, while cross-examining Ms. Pavel, Meltzer sought unsuccessfully to introduce into evidence a letter that Dr. Berry assertedly wrote about her to a third party—Meltzer apparently believed that the letter contained negative comments about Ms. Pavel, and, in some part, contradicted her testimony.

with an expert before trial about the prosecution's physical evidence. We characterized this pair of failures as one of the two "[more] compelling" sets of errors that supported our conclusion that the trial attorney had provided constitutionally ineffective assistance.

This case is substantially similar to *Lindstadt*. Both cases were essentially "credibility contests": In both cases, the only witnesses to the alleged abuse were its victims and the defendant, and there was no substantial circumstantial evidence of abuse. When a sex abuse case boils down to such a "credibility contest," physical evidence will often be important. Indeed, "many" sex abuse cases are "close ... on the evidence," *Swofford v. Dobucki*, 137 F.3d 442, 443 (7th Cir.1998), and when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of "neutral, disinterested" testimony that may well tip the scales and sway the fact-finder. *Williams*, 59 F.3d at 682 ("In a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important."). Because of the importance of physical evidence in "credibility contest" sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter. And because of the "vagaries of abuse indicia," such pre-trial investigation and analysis will generally require some consultation with an expert.[17]

For two reasons, that requirement applied here. First, there is no indication in the record that Meltzer had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand. *Cf. United States v. Tucker*, 716 F.2d 576, 581 (9th Cir.1983) (holding that, in a complex fraud case, "it should have been obvious to a competent lawyer that the assistance of an accountant [was] necessary"); *Knott*, 671 F.2d at 1212–13 (noting that counsel may be found to be ineffective for failing to consult an expert where "there is substantial contradiction in a given area of expertise," or where counsel is not sufficiently "versed in a technical subject matter ... to conduct effective cross-examination").

Second, there is an obvious, common-sense mismatch—which Meltzer himself recognized before trial—between (1) Matthew and David's medical indications (nothing abnormal about Matthew, and mild "redness" in David's anal area) and (2) the allegations against Pavel (that he anally sodomized the boys once a week for four months, and that he did so with even greater frequency in the days leading up to the examination of the boys).[18] But in the face of this glaring mismatch a reasonably professional attorney would not have sat on his hands, confident that his client would be acquitted. He would have consulted and been prepared to call an expert

17. *Lindstadt*, 239 F.3d at 201 (citing Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse*, 45 A.F.L.REV 261, 270 (1998) ("It is difficult to imagine a child abuse case ... where the defense would not be aided by the assistance of an expert.")). *See generally United States v. Tornowski*, 29 M.J. 578, 580 (1989) ("There is little question that child sexual abuse cases often present a fertile,

indeed, a necessary, area for expert assistance.") (collecting cases).

18. As *respondents* explain in their appellate brief, "[s]urely, the absence of physical trauma or injury is stunning in light of the ages of the victims, the fact that they alleged [Pavel] engaged them in anal intercourse on a weekly basis over a four-month period, and the fact that the last act allegedly occurred within days of their ... examination."

to drive this disparity home. *See generally Holladay v. Haley*, 209 F.3d 1243, 1251–52 (11th Cir.2000) (holding that an attorney's investigation is not "reasonable" within the meaning of *Strickland* when the facts of a case supply him with "notice" that a particular line of pre-trial investigation may substantially benefit his client, and he does not pursue it).

As to this point, the Eleventh Circuit's decision in *Holsomback v. White*, 133 F.3d 1382 (11th Cir.1998), is instructive. In that case, the habeas petitioner was convicted in state court of crimes related to the sex abuse of his children. The petitioner claimed that he received ineffective assistance because "his trial counsel[ ] fail[ed] to conduct any [pre-trial] investigation into the conceded lack of medical evidence [against the petitioner], including [trial counsel's] failure to consult with any physicians concerning the significance of the lack of medical evidence in the case." *See id.* at 1386. The Eleventh Circuit agreed, *see id.* at 1387, explaining:

> Although [the petitioner] had been accused of sodomizing his son repeatedly over a period of several years beginning when [the boy] was only four years old and continuing until he was nine, a rectal examination performed shortly after the last alleged incident of sodomy found no medical evidence of sexual abuse. Despite this apparent inconsistency, however, counsel consulted no physician in order to ascertain the significance of the lack of medical evidence. Moreover, ... despite the fact that counsel himself viewed the case essentially as a swearing match, turning entirely on whether the "jury believe[d] the child," he made no effort to support [the petitioner's] claim of innocence with disinterested medical testimony or other medical evidence suggesting that [the boy's] allegations were not credible. In particular, counsel declined to contact either the

physician who had examined [the boy] shortly after the last alleged incident of sodomy or [the boy's] family physician during the period of the alleged sexual abuse, both of whom were readily identifiable to him as potential sources of such disinterested testimony ....

> ...

> ... Had counsel interviewed the doctors, a subsequent tactical decision not to call them might have fallen well within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Having conducted no investigation into the significance of the lack of medical evidence that [the boy] had been sexually abused, however, [the petitioner's] counsel could not have made an informed tactical decision that the risk that the doctors might equivocate on the stand outweighed "what potential benefit might come from [their testimony]." Because counsel never actually spoke with the physicians, he remained entirely unaware ... of whether and to what extent their testimony might have helped [the petitioner's] case. In these circumstances, we cannot say that counsel's decision not even to contact the physicians as part of his pre-trial investigation was professionally reasonable.

*Id.* at 1387–88; *cf. Schell v. Witek*, 218 F.3d 1017, 1028–30 (9th Cir.2000) (in a case in which fingerprint evidence was the "only" evidence against the defendant, remanding for an evidentiary hearing as to whether defense attorney failed to consult with a fingerprint expert before trial, and stating that such a failure could have constituted ineffective assistance of counsel).

\* \* \* \* \* \*

In light of the *cumulative* weight of the three serious flaws in Meltzer's representation of Pavel described above, we hold

that Meltzer's representation did not fall within the Sixth Amendment's "wide range" of adequate assistance. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We must therefore consider whether Pavel was prejudiced by Meltzer's poor lawyering.

## 2. PREJUDICE

Under *Strickland,* an ineffective assistance of counsel claimant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

Here, the standard is met. As an initial matter, we note that in attempting here to show that Meltzer's performance was not deficient, *the State* emphasizes that the evidence that it mustered at trial against Pavel was relatively weak. *See, e.g., ante* n. 18. We agree. It therefore follows that confidence in the judgment of conviction entered against Pavel may be "undermine[d]" here by a relatively smaller quantity of prejudice than might ordinarily suffice.

With this point in mind, we note that each of the above-described flaws in Meltzer's representation, *see ante* II.C.1, prejudiced Pavel.

First, if Meltzer had so much as attempted to prepare a defense here, one of his initial steps would presumably have been to find ways to poke holes in the testimony of Ms. McKinstry. He would have been able to do so. Attached to

Pavel's habeas petition is an affidavit from Dr. Sandra Kaplan, a physician at Cornell University Medical College. Dr. Kaplan's affidavit states that Ms. McKinstry's evaluation of the boys was conducted in a manner that was flatly inconsistent with the relevant, publicly available guidelines of the American Academy of Child and Adolescent Psychiatry ("the Guidelines"). *See Lindstadt,* 239 F.3d at 201–02 (assuming that had the relevant trial attorney performed an adequate pre-trial investigation, the defense would have discovered various articles published in scientific journals). For example, Dr. Kaplan noted that Ms. McKinstry was unqualified to evaluate allegations that the boys had been abused because she (1) lacked requisite professional qualifications, and (2) was serving as the boys' therapist, and "[a]s the boys' therapist, Ms. McKinstry had a professional obligation not to serve as as an evaluator with respect to allegations of sexual abuse involving her patients." Moreover, Dr. Kaplan noted that in cases of alleged intra-family sex abuse such as this one, in which there are discernible "indicia of false allegations," [19] the Guidelines require an "evaluator" of abuse allegations to "obtain a history from the perspective of *each* parent" (which Ms. McKinstry did not do) and/or to conduct joint sessions with both parents and the children present (which, again, Ms. McKinstry did not do). Similarly, Dr. Kaplan noted that the boys were interviewed repeatedly concerning their father's alleged abuse, and that "the [G]uidelines warn [that] multiple interviews merely encourage the child to create a story to meet the demands of [interviewing] adults for more information." [20] *See generally,*

---

**19.** The "indicia of false allegations" described in the Guidelines, and present here, were (1) that a parent first suggested to the therapist that her children were being abused, (2) that one of the allegedly abused children was a pre-schooler, and (3) that there was an ongoing custody battle between the parent who

brought the children to the therapist and the parent accused of abusing the children.

**20.** Dr. Kaplan also noted that the boys were not interviewed using a standardized questionnaire, and opined that

*e.g.*, Jacqueline Miller Beckett, Note, *The True Value of the Confrontation Clause: A Study of Child Sex Abuse Trials*, 82 GEO. L.J. 1605, 1606 (1994) ("many children have trouble distinguishing fact from fiction and are willing to lie if they are rewarded for telling such stories") (collecting sources, *id.* at 1633–37).

■ Second, for the reasons stated above, *see ante* II.C.1.b.(i)-(ii), if Meltzer had put Clothilde Pavel and Dr. Berry on the stand, their testimony would have substantially buttressed the defense's theory of the case—even if a skilled prosecutor could have suggested that some of the details of Clothilde Pavel's testimony were presented in an arguably hyperbolic fashion.[21] *See* AFFIDAVIT OF CLOTHILDE PAVEL ¶ 5 (executed March 27, 1992) (stating that

Clothilde Pavel, Pavel, and the boys "*literally* spent all of our time together" during the Florida trip) (emphasis added).

Third, had Meltzer conducted an adequate pre-trial investigation of the physical evidence against Pavel, and sought a medical expert who might have testified on behalf of the defense, there can be little doubt that Meltzer would have come across and called to the stand a physician such as Dr. Margaret McHugh—a physician with extensive experience in, *inter alia*, evaluating and/or treating victims of child abuse.[22] In an affidavit submitted in the state-court post-conviction proceedings, Dr. McHugh stated unequivocally that the boys' medical condition was simply not "consistent"—as Dr. Madden had

---

the use of a standardized protocol when interviewing young children who are alleged to be the victims of sexual abuse is critical because it insures that the interviewer will not use leading questions which unduly influence the child or suggest a desired response. In this instance, it is apparent that leading questions were used throughout the children's numerous interviews.... Given this history of numerous, improperly conducted interview sessions with both boys, as a professional child psychiatrist experienced in the evaluation of claims of sexual abuse, I would consider the boys' stories inherently unreliable.

**21.** Respondents contend that Clothilde Pavel's testimony would not have been admissible at Pavel's trial because it was not relevant. Mrs. Pavel's putative testimony, respondents note, related to events that assertedly took place in Florida, and Pavel was not indicted based on those events. This argument is based on no citations to New York law, and it is wholly unpersuasive: Evidence that tended to demonstrate that the boys were not telling the truth about Pavel's sexual abuse was undoubtedly relevant here, *see People v. Warner*, 52 A.D.2d 684, 382 N.Y.S.2d 377, 378–79 (3d Dep't 1976) ("[a]ny evidence which is helpful in getting at the truth of the material issue is relevant even though it is only a link in the chain of facts which must be proved to make

the proposition at issue appear more or less probable") (emphasis added), especially in light of the fact that the boys testified at great length during their direct examinations as to what allegedly had happened to them in Florida. Respondents argue also that the testimony of both Clothilde Pavel and Dr. Berry would not have been admissible at trial because it concerned the "collateral" matters of whether the testimony of the boys and Ms. Pavel was credible. This argument is not persuasive—and as to Clothilde Pavel's testimony, it borders on the frivolous. *See People v. Hudy*, 73 N.Y.2d 40, 538 N.Y.S.2d 197, 207, 535 N.E.2d 250 (1988) ("extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground") *abrogated on other grounds by Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000); *People v. Beavers*, 127 A.D.2d 138, 514 N.Y.S.2d 235, 238 (1st Dep't 1987) ("evidence [is not] collateral when it tends to impeach a witness's credibility with respect to the very issues the jury is asked to resolve").

**22.** According to her uncontroverted affidavit, Dr. McHugh has evaluated, examined, and/or treated approximately 5,000 sexually-abused children, and she has authored, *inter alia*, "the standard medical protocol in suspected child sexual abuse cases in the First Department [of the New York state court system]."

testified—with their having been repeatedly anally sodomized with the frequency that they described:

> I have reviewed the Grand Jury and trial testimony of Matthew and David Pavel....
>
> . . . .
>
> It is my opinion, to a reasonable degree of medical certainty, that the clinical findings regarding Matthew and David are inconsistent with their testimony. Repetitive sexual attacks of the nature described by the boys, by an adult male without the use of a lubricant and/or sedation would be expected to result in clinical evidence such as tearing injuries and abrasions to each child's anus and rectum *which would [have been] apparent on gross examination.*
>
> I have also reviewed the testimony of Dr. Celeste Madden. Dr. Madden testified that the absence of *any* abnormal findings in Matthew's physical examination is not inconsistent with the crimes of sodomy and sexual abuse. Given the boys' testimony, however, it is highly improbable that such repeated attacks within five (5) days of the exam would leave *no* physical evidence.
>
> ... [As to David, on whom a "mild perianal erythema" was noticed,] "[c]*learly*, the numerous acts of sodomy described by David would be expected to result in more than a mild erythema, *i.e.,* a slight red discoloration.

(Emphasis Added)

 In light of the weakness of the prosecution's trial evidence, *see ante* at 225, Dr. McHugh's opinion casts a long shadow over this case.[23] And in combination with the other points described above, *see ante* at 225–28, it leads us to a disturbing conclusion: Had Meltzer performed in a constitutionally effective manner, there is—at the very least—a "reasonable probability" that Pavel would not have been convicted of the crimes with which he was charged, and for which he has been punished these past eleven and a half years.

\* \* \* \* \* \*

Before concluding, we pause briefly to commend Kelley Drye & Warren, which took on this matter *pro bono publico* over eight years ago, and has now seen it through. Kelley Drye's work on this case has been tenacious and consistently skillful, and by providing their client with superbly *effective* assistance of counsel, the firm has acted in the best traditions of our profession.

## IV. CONCLUSION

For the reasons stated above, we hold that the state judgment of conviction

---

**23.** Respondents argue that no defense expert would have been permitted to testify at trial because "[e]xpert opinion testimony is not admissible for matters that can be determined by a juror using common sense and life experiences. Consequently, a medical expert witness called to testify that the lack of injury to the children was an indication the acts were not committed properly would not have been allowed simply because the particular subject matter clearly does not require any particular medical expertise." This argument is utterly without merit. We know of no authority for the proposition that the defense is not permitted to call an expert to interpret particular medical records *after the prosecution has been given an opportunity to call its own expert to interpret the medical records. See generally People v. Cronin,* 60 N.Y.2d 430, 432, 470 N.Y.S.2d 110, 111, 458 N.E.2d 351 (1983) (Judith Kaye, *Chief Judge* ) ("Both sides may of course cross-examine and impeach the opposition's experts, and adduce different opinions *through their own experts.*") (emphasis added). Respondents do themselves no credit by claiming that the petitioner should be kept in prison on the basis of this all-but-frivolous argument, and the similarly trivial arguments as to Clothilde Pavel's testimony described in note 21.

against petitioner-appellant Kenneth G. Pavel was entered in violation of his rights under the Sixth Amendment to the United States Constitution. Accordingly, we

(1) reverse the judgment of the District Court,

(2) vacate the state court judgment of conviction,

(3) and remand the cause.

On remand, the District Court shall issue a writ of habeas corpus to Mr. Pavel on the thirtieth calendar day after the issuance of our mandate unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry Pavel.

The mandate shall issue forthwith. If further proceedings arising from Pavel's habeas petition are required in this Court, the parties shall inform the Clerk of this Court. Jurisdiction will then be automatically restored to this Court without need for a new notice of appeal. *See United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994). After jurisdiction is restored, the Clerk shall set an expedited briefing schedule, and the matter will then be heard by this panel on letter briefs.