**David R. MILLER, Petitioner,**

v.

**Daniel A. SENKOWSKI, Superintendent of Clinton Correctional Facility, A State Prison of Northern New York State, Respondent.**

**No. CV 00–0208(DRH)ETB.**

United States District Court,
E.D. New York.

June 24, 2003.

As Amended July 22, 2003.

Federal Defender Division Appeals Bureau by Darrell B. Fields, Esq., New York City, for Petitioner.

Suffolk County District Attorney's Office by Thomas C. Costello, Esq., Riverhead, NY, for Respondent.

## AMENDED [1] MEMORANDUM & ORDER

HURLEY, District Judge.

## I. Background

### A. Procedural Background of the Habeas Petition

This 28 U.S.C. § 2254 habeas corpus application was commenced by the filing of a petition on January 10, 2000. In connection with this petition, the Court issued an Order to Show Cause for the Respondent to answer. Thereafter, the petition was respectfully referred to Magistrate Judge E. Thomas Boyle for a report and recommendation. Judge Boyle's Report and Recommendation ("Report") was received by this Court on July 24, 2002. Judge Boyle recommended, in his thorough and well-reasoned Report, that the application for a writ of habeas corpus be granted on the grounds that (1) Petitioner's trial counsel was constitutionally defective and (2) that Petitioner's sentence was retaliatory.

Respondent was required to file any objections within 10 days of being served with a copy of Judge Boyle's report. Respondent filed timely objections. However, in an order dated September 3, 2002, this Court ruled that those objections were not sufficiently detailed to trigger de novo review of the petition. In that same order, this Court directed Respondent to cure these defects within 10 days or the Court would not apply de novo review to the Magistrate Judge's report.

As of the date of this order, no renewed objections to the Magistrate Judge's Report have been submitted to the Court. Nonetheless, the Court, considering the importance of the subject matter, declines to review the Report for clear error. Instead, the Court conducts a de novo review of the Report.

### B. Factual Background of the Underlying Conviction and Subsequent Appeals.[2]

Petitioner was arrested on February 16, 1995. On February 24, 1995, Suffolk County Grand Jury indicted Petitioner on four counts of sodomy in the first degree, one count of rape in the first degree and one count of endangering the welfare of a child. The child was Chanel, the then-ten-year old daughter of Petitioner's ex-girlfriend, Debra. Petitioner, Debra and Chanel are all of african-american descent.

Before trial, the state made a plea offer to Petitioner of two (2) to six (6) years. At the time, the Honorable Gary J. Weber,

1. The Court amends this order to address typographical errors on pages 9 and 24 of the original order. The Court also notes that the time period for New York State to take "concrete and substantial steps expeditiously to retry [Petitioner]" runs from the date of docketing. See *infra* at 36–37. This order has now been docketed on two dates—the date of the original order and the date of this amend-

ed order. To avoid any confusion, the Court concludes that the "date of docketing," for the purpose of measuring the relevant time period in which New York State must act, shall be the date of docketing for the original order.

2. These facts are discussed with greater detail in Magistrate Judge Boyle's report.

Judge of the Suffolk County Court ("Judge Weber"), stated that if the plea was accepted that day, he would be as "lenient as the law allows me" but that "he would not be thinking of that" at sentencing if Petitioner stood trial. Petitioner declined the offer maintaining that he was innocent of the charges. Petitioner said, "This moment in time, I would like to say that I think the offer is rather good for a person guilty of this crime. But, at this time, and at the time before my arrest, I was not guilty, and I'm still not guilty. So I'm not taking [the offer]. . . ." Suppression Hearing Tr. at 46. The case was thereupon scheduled for trial.

Scott Allen, Esq. ("Allen"), Petitioner's assigned counsel at the time, made an application to adjourn the trial for approximately one week due to Allen's own health problems. On Tuesday, January 16, 1997, the court held a hearing on the adjournment request. At the hearing, Allen indicated that complications with a bone marrow transplant would cause him to be hospitalized for the next week, during which time Petitioner's trial was scheduled to begin. Allen, who was hospitalized later that day, said, "I would either request the Court to try to see if it can reschedule things to grant me that week to enter the hospital and get treated and continue recovery, or for the Court to do whatever it feels is appropriate." Allen further indicated that there was no guarantee that he could resume Petitioner's defense after one week and that later complications caused by his lowered immune system could further delay the proceedings. Judge Weber said, "[m]y inclination is not simply to grant an adjournment, but to relieve you [Allen] from the case." Judge Weber then asked Petitioner to state his opinion on the issue. The conversation between the court and Petitioner was as follows:

MILLER: Your Honor, I feel very comfortable with Mr. Allen. And if it pleases the Court, I wish to continue to proceed on with these procedures with Mr. Allen whenever he is straight.

COURT: Except, the problem there is, [Petitioner], I have no way to guarantee that Mr. Allen is going to be able to proceed on an adjourned date that I set. That has got two bad consequences. One, this case gets old. And, No. 2, you're in custody. So it's not good for your interests. Do you understand?

MILLER: Yes, I do.

COURT: Suppose, Mr. Allen, this is a recurring thing with him? Suppose what happens is that after a week or so, even assuming that week schedule proves true, that he comes back. It's wintertime now, and he catches influenza in the middle of your trial, then what do we do? So anyway, I think with those things in mind, it's probably a good idea that we should relieve Mr. Allen, don't you?

MILLER: OK, your Honor. How long will this next lawyer have to familiarize himself?

COURT: There is a couple of things— the hearings have been done. What I'll do, whatever I find, I'll supply him with a copy of the decisions. A lot of the preliminary work has already been done by Mr. Allen. I don't know if the man will need that long a time. I'm thinking in terms of starting it up next week, but I will have the guy work on it today or tomorrow for sure. OK, [Petitioner]? Don't forget, there is further time on these things, because jury selection takes some time, and you can be working on that. So it's not a complete waste. With that in mind, I'm going to relieve Mr.

Allen. I'm going to be putting the case on the calendar, however, for tomorrow only for the purposes of seeing if I can have a new 18–B person in place for that day, and Mr. Allen is relieved ...

Hearing Tr. at 4–6.

The next day, on Wednesday, January 17, 1996, the court appointed John Jiras, Esq. ("Jiras")[3] to represent Petitioner. Jury selection and trial began on the following Monday, January 22, 1996. Jiras did not request any adjournment of the trial for additional time to prepare Petitioner's defense.

Before jury selection, Jiras made a motion to dismiss counts one, two, four, five and six of the indictment. Counts one and two of the indictment charged Petitioner with anal and oral sodomy in the first degree on occasions occurring between April 11 and June 24, 1993; count three charged Petitioner with rape in the first degree on June 24, 1993; counts four and five charged Petitioner with anal and oral sodomy in the first degree on occasions occurring between September 1 and October 31, 1993; and count six charged Petitioner with endangering the welfare of a child between April 11 and October 31, 1993. Jiras argued that counts one, two, four, five and six of the indictment should be dismissed because Petitioner was deprived of his right to develop an adequate defense, and specifically an alibi, by the indictments non-specific allegations of sexual abuse over a three-month period (with the exception of count three). Judge Weber denied the motion.

Jury selection began on January 22, 1996. Three panels of prospective jurors participated in the process over the course of three days. Judge Weber issued preliminary instructions to all of the prospective jurors. One of these preliminary instructions directed the jurors to evaluate all evidence fairly and impartially. The prosecution and defense counsel were also allotted time to conduct their own voir dire.

During the voir dire process, Jiras first advanced his theory as to why Chanel might not be telling the truth. As the Court understands the theory, Jiras was attempting to convey the idea that a poor child without both a mother and a father in the home is less likely to tell the truth than a corresponding child with greater economic means and a stable homelife. Jiras referred to this hypothetical child of economic and familial stability as "Beaver," referring to the eponymous character from the television show "Leave it to Beaver."

The first jury panel was asked by Jiras if they agreed that the character of the parents, and particularly the mother, would significantly influence the upbringing of a child. The panel agreed. Jiras then asked whether a child's veracity might be affected by a mother of questionable character. Two prospective jurors acknowledged that a child's environment could affect that child's credibility. Jiras later asked an african-american prospective juror whether race would affect his ability to act as a juror. The prospective juror answered that it would not.

The second day of jury selection involved the adding of more potential jury members to the jury pool. At this time, Jiras discussed his theory regarding credibility and stable homelife with one panel member. The potential juror, Mr. Reaves, disputed Jiras' proposed direct correlation

---

**3.** Mr. Jiras died on January 3, 2001, prior to Respondent's reply to the application for a writ of habeas corpus.

between stable homelife (as well as legitimacy) and the existence of some type of disadvantage. Mr. Reaves stated that "My son was born out of wedlock. I'm now married to his mother. Does that put him at a disadvantage up until that point?" Eventually, however, Mr. Reaves conceded that it is possible that "within that kind of difficult environment[,] that a child and her credibility might be affected...." Although Jiras continued to ask the potential juror whether a child in a stable homelife would be more "susceptible to the truth" than a child born out of wedlock, the potential juror declined to make such a broad generalization. Eventually, Jiras moved on to another panel member. Jiras would eventually exercise a peremptory challenge to strike Mr. Reaves from the panel.

Another panel member, who worked for a child welfare agency, took issue with Jiras' theory. She stated, "It sounded like what you were trying to say if you are born out of wedlock you are at a disadvantage. There are a lot of parents that treat their children very very [sic] good in a lower socioeconomic neighborhood, but I don't think it has anything to do with the credibility of a child to tell the truth." This potential juror was eventually chosen to serve on petitioner's jury.

Later, Jiras queried a different panel member who had relatives that were police officers. Jiras asked,

MR. JIRAS: And [the police officers talk] about the environment that these people come out of?

PROSPECTIVE JUROR: Yes.

MR. JIRAS: And they talk about the disadvantage that they are at sometimes because of that environment?

PROSPECTIVE JUROR: Yes.

. . . . .

MR. JIRAS: And you understand what I'm trying to talk about, about family

backgrounds and family function? Do you disagree with my position that someone coming out of, a child grown out of wedlock or never resolves itself into marriage, lives in a community that you would, is unbelievable [sic] at a disadvantage as opposed to little Beaver?

PROSPECTIVE JUROR: In a ways, [sic] yes, they are.

MR. JIRAS: And, therefore, consequently, and I hate to use this word, I'm not going to say credibility because that is too strong a word to attribute to a 12 or 10 year old, let's say inversion of what reality is, is certainly influenced, isn't it?

PROSPECTIVE JUROR: It could be, yes.

Jury Selection Tr. at 223–24. This potential juror was eventually selected to serve on Petitioner's jury.

On the third day of jury selection, Jiras began his portion of the voir dire by stating:

If little Beaver was raped I think little Beaver, now you be the judge of this remark, little Beaver would probably be more capable of a truth than someone who came from out of an environment like this. There is no question that this environment is outrageous. Also, that is a two-way street but he has contributed to that environment so, you have to consider that as well. I mean, the father of little Beaver will probably be more capable of the truth than he [Miller] is because of his environment and he who create [sic] that environment. I think you have to realize -

Jury Selection Transcript at 271. At this point, the prosecution requested a side-bar conference, wherein Jiras, prompted by the prosecution's complaint, agreed to cease arguing his case to the jury pool.

Judge Weber subsequently cautioned Jiras that his remarks implied that Petitioner had an obligation to testify. Jiras responded that Petitioner would testify and curiously stated that he (Jiras) was "the captain of that ship." *Id.* at 272.

Jiras then returned to questioning the panel and stated:

What I'm saying, do you feel—now I finally have the question—do you feel an environment that it will be established that this little girl came out of could have in the way affect her credibility? Living in the house that no one is married and people in and out of there in the neighborhood, do you think it would affect her credibility? Not that she is not capable of the truth. I'm not saying that, but do you think it could affect her credibility.

*Id.* at 273. Two prospective panel members, responded by saying "No." *Id.* at 273–74. Neither of these panel members were selected to serve on Petitioner's jury.

The trial commenced on January 25, 1996. Jiras, in his opening statement, asserted that the allegations made against Petitioner came from one impeachable individual, Chanel, and that her mother, Debra, conspired with her two daughters to falsely accuse the petitioner. Tr. at 31. Jiras also told the jurors that the petitioner would present "specific" evidence that Chanel's mother told Petitioner she would have the charges against him dropped if he would marry her. Trial Tr. at 32.

In fact, we are going to present evidence, not speculative evidence—we are going to present evidence to you, specific evidence to you, that will show the mother even told the defendant that if he would marry her, she would have the children drop the charges, or this child drop the charges, *because there were two charges brought, not by this one little girl, this little, pink dress, but the other sister, too. There were charges that were attempted to be brought that he did something to her as well.*

Trial Tr. at 32 (emphasis added). This was the first and only mention of allegations from Chanel's sister ("Sister") that she had also been sexually assaulted by Petitioner.

Chanel was the first witness. She testified that in 1993, when Chanel was ten years old, the petitioner sexually abused her between April and October of 1993. She remembered the first time the defendant sexually abused her as occurring shortly after Easter in 1993. She testified that Petitioner had taken her out of school saying that she had a doctor's appointment. Instead, Petitioner drove her home where he allegedly orally and anally sodomized her. Chanel also testified that Petitioner allegedly raped her on June 24, 1993, the day of her sister's middle school graduation. She explained that she did not report these incidents right away because the defendant told her that he would kill her and she knew he had a gun. Her testimony stated that the pattern of oral and anal sodomy continued until two weeks before Halloween of 1993. This pattern included no other specific dates but did occur "at least 10 times."

Chanel further testified that she twice ran away from home during the period that Petitioner lived with her. Both times she returned to live at her mother's house. Shortly after October 31, 1993, Chanel and her sister went to live with their great-grandmother permanently because her mother never returned to pick them up. Since then, Chanel testified she had seen her mother rarely and only returned to the home that was shared with Petitioner once. Chanel testified that she told no one about the abuse until January 23, 1995, when she told her great aunt.

Jiras cross-examined Chanel. First, Jiras established whom Chanel had told about the assaults and when she had told them. Then, he asked if anyone was around when the alleged abuse occurred. Chanel revealed that Petitioner's biological daughter and her boyfriend had been in the other room watching television on one occasion when Petitioner allegedly sodomized her in his bedroom. Jiras also asked Chanel whether she ever wanted her mother and Petitioner to marry, or heard them talk about marriage. Chanel testified that she never thought about her mother marrying Petitioner and that she never heard her mother and Petitioner discuss marriage. Jiras also asked what Chanel knew about her mother's drug problem. She answered that she had heard members of her family discuss it. Jiras did not cross-examine Chanel concerning the time lapse in the complainant's revelation of the alleged sexual abuse.

Chanel's great-grandmother also testified. She stated that Chanel's mother was a drug user. According to the great-grandmother, Chanel and her Sister came to live with her after October 31, 1993, because Petitioner and the mother's fighting scared the children. She also testified that Chanel wet her bed often. However, the great-grandmother admitted that she did not tell Dr. Milton Gordon ("Dr.Gordon"), the pediatrician who was asked by Child Protective Services to examine Chanel, about these bed-wetting episodes.

Dr. Gordon testified as to the results of his medical examination of Chanel on March 17, 1995. Dr. Gordon found an irregular triangular formation on the labial area of the vagina which he opined was evidence of vaginal trauma and penetration. Dr. Gordon could not identify how or when the trauma or penetration occurred, or even what kind of foreign object may have caused the penetration.

When Jiras asked whether masturbation could have caused the observed vaginal trauma, Dr. Gordon said no. Jiras did not query as to the precise scientific support for that opinion.

Dr. Gordon's found no other evidence of sexual abuse or of trauma. Dr. Gordon's Toluidine Blue Dye Test came back negative, indicating no irritation, rubbing or trauma to Chanel's anal region. Dr. Gordon referenced an "important" Johns Hopkins study to explain that a negative Toluidine Blue Dye test did not necessarily indicate that no abuse occurred. He stated the victim's body may have already healed itself. Dr. Gordon further explained the lack of evidence by stating "there would have to be a reoccurrence of anal sodomy at least a dozen times within six months." Though Jiras cross-examined Dr. Gordon, he never questioned Dr. Gordon about the conclusions or studies relating to anal sodomy.

Dr. Gordon also testified that possible behavioral signs of sexual abuse included newly manifested clinging behavior and irritability; loss of bowel and bladder control; thumb sucking; renewed need for a security blanket; withdrawal; sleeping disturbances, including bed-wetting; and eating disorders.

Jiras cross-examined Dr. Gordon about each and every finding in the medical report. As conducted by Jiras, this was a slow and unfocused process. Judge Weber eventually stated "We're getting tired of going through the pages.... Why don't you come down to the important parts of it?" Despite Jiras' desire to cover the report line-by-line, he did not ask every question that may have been helpful to Petitioner's defense. For example, he failed to cross-examine on the following issues: (1) Dr. Gordon's conclusion that the deformation of the hymen evidenced trauma and penetration, (2) Dr. Gordon's

conclusion that evidence of anal sodomy would only be observable after twelve instances of anal sodomy over a six month period, (3) Dr. Gordon's failure to visually record his examination of Chanel and (4) Dr. Gordon's references to academic studies that supposedly supported his conclusions.

Dr. Eileen Treacy, a child psychologist, testified as to the nature and stages of child sexual abuse syndrome. While Treacy acknowledged that she did not interview Chanel, she testified that child abuse victims may exhibit signs of regressive behavior, including bed-wetting.

Jiras cross-examined Dr. Treacy about a child's view of rape and sexuality. Dr. Treacy suggested that a child's view might be affected if she was raised in a culture that felt "if a girl loses ones [sic] virginity, that she's then stigmatized and damaged goods...." At this point, Jiras pursued a perplexing line of questioning.

JIRAS That certainly doesn't happen to somebody from Wyandanch who is black, right?

TREACY That's a very dangerous stereotype there that you're presenting. There are, undoubtedly, people who live in Wyandanch, who are black, who hold stigmatization in very high regard regarding their children's virginity.

JIRAS You think there are black people that live in Wyandanch that live in a house where people aren't married hold that kind of regard?

TREACY I think that there probably are people who are African–Americans who live in Wyandanch who are not married, as there may be European–Americans in Wyandanch who live together who may not be married.

Trial Tr. at 390–92. Jiras and Dr. Treacy then spent a period parring over whether the people in Wyandanch are generally poor and of african-american descent. Af-

ter this exchange, Jiras began again by asking,

MR. JIRAS: Let me start over again. We talked about a certain environment of drug addiction. You talked about a certain environment of overcrowding conditions. We talked about certain conditions with a male and a female living together as man and wife when they're not married. We talked about young girls living up in that environment, and I asked you are these [sic] disadvantaged? "They" being the little girl.

. . . . .

TREACY: I said from a socio-economic perspective, they were disadvantaged, yes.

*Id.* at 393–94.

On re-direct, the prosecution asked Dr. Treacy whether there was any correlation between a person's socioeconomic background and his or her credibility, to which Dr. Treacy unequivocally responded that there was no such correlation. *Id.* at 397. On re-cross Jiras again broached the issue of the alleged witness' credibility.

JIRAS: "Leave it to Beaver" and this complaining witness are equally credible; is that what you're telling me?

TREACY: I did not comment on this child's credibility, and I certainly am not going to comment on Beaver's credibility.

*Id.* at 409.

The Sister also took the stand. The Sister had no direct knowledge of the abuse. Jiras extensively cross-examined the Sister about entries in her diary. These entries described her engaging in sexual intercourse. The Sister claimed that these entries were fictional descriptions of sexual "fantasies." The Sister further claimed that she concocted these fan-

tasies to satisfy her friends, who teased her about her lack of sexual experience.

Collin Sheppy, owner of the taxi cab company where Petitioner worked, testified on rebuttal about Petitioner's work schedule and duties. This was the sole prosecution witness that Jiras chose not to cross-examine.

Other witnesses testified for the prosecution but their testimony is not germane to our discussion. Their testimony is discussed more extensively by Magistrate Judge Boyle's report.

Petitioner took the stand for the defense. Petitioner testified that, after living with Chanel and Debra, her mother, from 1990 to 1993, he moved out of the house in the middle of May 1993 and moved in with another girlfriend and her twin daughters. Petitioner testified that he left Debra because of her drug problem and because they disagreed about the way Chanel and her Sister should be raised. Petitioner testified that he had discovered the Sister's diary and found entries describing sexual intercourse. Petitioner said that the mother did nothing when he brought this information to her attention.

While on the stand, Petitioner acknowledged also that he had a 1985 conviction for Criminal Impersonation and that he had fraudulently accepted payments from Social Services. Petitioner's neighbor, testified that she heard Petitioner and Debra argue constantly. She recalled that these arguments began around June of 1993. The neighbor also testified that Petitioner was a good neighbor who worked hard to maintain his property.

Jiras called no additional witnesses. Jiras stated in his summation that he never called the alleged victim's mother because he could not locate her. He never requested an adjournment before or during trial to find the mother.

During his closing argument, apparently abandoning the theory that there was a conspiracy to manufacture these charges, Jiras argued that Petitioner was not living in Chanel's house when the alleged sexual abuse was said to have occurred. Jiras also noted the lack of forensic evidence corroborating the allegations and the delay in reporting the alleged abuse. Also in the closing, Jiras addressed his client's own veracity, "[W]e have a defendant that gets on the stand, a defendant that, we have found out on cross examination is a liar because he lied to a police officer about his brother's license, a defendant who is a social services rip-off, a defendant who is a womanizer, a defendant that selects ladies to live with . . . ." Trial Tr. at 764. Jiras inaccurately stated that there were 30 to 40 alleged acts of abuse rather than the more accurate description of "more than ten" occasions. *Id.* at 739–41. Jiras also referred to Chanel and other witnesses by the wrong name. *See, e.g., Id.* at 745. Finally, Jiras revisited the theory that Chanel was not raised in a situation that promoted trustworthiness.

> I'm suggesting that [Petitioner] finds himself in a community—and, remember, when we were voir diring [sic] the jury, I may have offended some people. I know I offended a couple of them because I had a fight with them. Some of you weren't there when the fight occurred. Some people think that I am trying to say in the Brady Bunch, this wouldn't happen; that there is a condition of one's environment that affects one's credibility. There's no question of that. This environment that that poor girl lived in, no question, was affected by the mother of hers, no question of that, that junkie mother that is running around.

Trial Tr. at 767.

The prosecutor's summation highlighted Jiras' failure to follow through on the conspiracy theory.

The defendant promised you in his opening remarks that you would hear evidence that Debra and her girls made this up as a conspiracy in order to force the defendant to marry Debra, and the defendant asked almost all the People's witnesses: Did you ever hear any arguments about marriage?

Trial Tr. at 804. Finally, the prosecutor urged the jury to not allow Chanel's background affect their decision.

Throughout this trial, he [Jiras] has suggested, and I go back as far as voir dire, that Chanel is prone to lie. She is a poor, black child from Wyandanch—his words. If that were true, ladies and gentlemen, why then our justice system could only protect rich, little white kids. I don't buy that theory, and I think I know you don't either..... Ladies and gentlemen, the scales of justice are balanced by a woman who wears a blindfold, and she protects the black and the white, the rich and the poor, Jews and Christians, Asians and Indians, immigrants, people from Wyandanch and ten-year old little girls like [the alleged victim], but our blindfolded lady is only an ideal. You are not. You are real, and you have been silent for a long time, exhibiting great patience and attention throughout the course of this trial. Your service to the State of New York is not an easy one. I wish you courage and strength as you commence your deliberations.

Trial Tr. at 811–13.

The jury found Petitioner guilty of two counts of sodomy in the first degree, one count of rape in the first degree and one count of endangering the welfare of a child. Petitioner was acquitted of two counts of sodomy in the first degree. At sentencing the prosecution recommended a 12 to 36 year sentence. Sentencing Tr. at 5. Petitioner's new attorney, John O'Brien, Esq., who represented Petitioner at the sentencing, requested the minimum sentence. *Id.* at 6. On May 6, 1996, Petitioner was sentenced to 18 to 54 years.[4]

Petitioner appealed his conviction to the Appellate Division, Second Department. He raised at least three arguments on his direct appeal to the Appellate Division: (1) that Jiras rendered him ineffective assistance of counsel because of Jiras' general ineptitude and his prejudicial remarks against African Americans, poor people, and his own client; (2) that the evidence was insufficient to maintain a conviction and against the weight of the evidence; and (3) that imposed sentence of 18 to 54 years was a harsh and excessive punishment for exercising his right to a trial, especially in light of the fact that he had been offered a plea bargain of a 2 to 6 year sentence.

The Appellate Division affirmed the conviction on February 8, 1999. The court stated that:

[W]e find that [the evidence] was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence.

Contrary to the defendant's contention, 'the evidence, the law, and the circumstances of [the] case, viewed in totality and as of the time of the representation, reveal that' the defendant was provided with meaningful representation.

---

**4.** Petitioner received a term of imprisonment of 5 to 15 years on one sodomy count, a consecutive term of 6 to 18 years on the second sodomy count, and a consecutive term of 7 to 21 years on the rape count. A 1 year prison term for endangering the welfare of a child was to run concurrently with the consecutive 18 to 56 year sentence.

The sentence imposed was neither harsh nor excessive.

*People v. Miller*, 258 A.D.2d 535, 684 N.Y.S.2d 793 (2d Dep't 1999) (citations omitted).

The New York Court of Appeals denied petitioner's request for leave to appeal on March 24, 1999. *See People v. Miller*, 93 N.Y.2d 876, 689 N.Y.S.2d 438, 711 N.E.2d 652 (1999).

## II. Discussion

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a court may only issue a writ of habeas corpus for a state prisoner if the state-court adjudication was (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir.2001) (*quoting Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)). If the state court arrives at a conclusion of law opposite to that reached by the Supreme Court or decides a case differently "on a set of materially indistinguishable facts," that decision may be considered "contrary to" established federal law. *Lindstadt*, 239 F.3d at 198. Similarly, if the state court unreasonably applies the correct principle from the Supreme Court jurisprudence that would be considered an "unreasonable application." *Id.*

### A. Ineffective Assistance of Counsel.

"In a petition for habeas relief alleging ineffective counsel, the question as to whether the matter is governed by existing Supreme Court precedent 'is easily answered because the merits of [such] claim[s] are squarely governed by [the Supreme Court's] holding in *Strickland v. Washington* [, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ].' " *Lindstadt*, 239 F.3d at 198 (citations omitted). Pursuant to *Strickland*, the respondent ordinarily must show: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88, 104 S.Ct. 2052. The latter showing is required because even a professionally unreasonable error by counsel does not warrant setting aside a proceeding if such error did not affect the outcome of the proceeding. *Id.* at 691–92, 104 S.Ct. 2052.

■ In certain discrete circumstances, the courts have recognized unusual cases in which prejudice may be presumed. One example is a situation in which there is a showing of actual conflict of interest between the defendant and his attorney. *Id.* at 692, 104 S.Ct. 2052; *but see Smith v. Robbins*, 528 U.S. 259, 287, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("requir[ing] the defendant to show that the conflict adversely affected his counsel's performance."). Likewise, prejudice may be presumed where counsel is physically absent during a critical stage of the proceedings, *see Geders v. United States*, 425 U.S. 80, 88–89, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), or where the attorney sleeps through a substantial portion of the trial, *see Javor v. United States*, 724 F.2d 831, 833 (9th Cir.1984). *See also United States v. O'Neil*, 118 F.3d 65, 70–71 (2d Cir.1997). There is no suggestion that Jiras' conduct—including his social and economic theories, with their concomitant racial undercurrents—should warrant a per se finding of prejudice.

To demonstrate constitutionally ineffective assistance of counsel, Petitioner is ob-

ligated to demonstrate that his counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. "In gauging the deficiency, the court must be 'highly deferential,' must 'consider[ ] all the circumstances,' must make 'every effort ... to eliminate the distorting effects of hindsight,' and must operate with a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...' " *Id.* at 688–89, 104 S.Ct. 2052. Magistrate Judge Boyle identified 6 "serious errors" that contributed to the denial of effective assistance of counsel. These errors included:

1. The inadequate opportunity to prepare for trial.
2. The trial court's failure to grant Allen's request for an adjournment.
3. Trial counsel's failure to perform a reasonable investigation
4. Trial counsel's "Racial View on Credibility of Complainant."
5. Trial counsel's "Disclosure of Other Acts of Sexual Abuse."
6. Trial counsel's failure to offer proof on the "failure to marry defense."

The Court will discuss these errors in order and, ultimately, evaluate them collectively.

1. The inadequate opportunity to prepare for trial.

There are circumstances in which late designation of trial counsel may combine with other factors to give rise to a presumption of prejudice. In *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Court held that the defendants were deprived of effective assistance of counsel where they were assisted by an out-of-state lawyer, appointed on the day of the trial, who did not have an opportunity to prepare the case or familiarize him-

self with local procedure. However since its decision in *Powell*, the Supreme Court has clearly stated that late appointment of counsel does not in itself give rise to a presumption of prejudice. *See Chambers v. Maroney*, 399 U.S. 42, 54, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). "[O]nly when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *United States v. Cronic*, 466 U.S. 648, 661, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Unless those specific circumstances are satisfied, the proper inquiry is whether the late appointment combined with *other errors at trial* collectively (1) rose to a sufficient level to be considered ineffective and (2) prejudiced the petitioner's trial. *Id.; see also Aeid v. Bennett*, 296 F.3d 58, 62 (2d Cir.2002) (all ineffective assistance of counsel theories of habeas relief require a showing of actual prejudice).

In *Cronic*, the Supreme Court reviewed defense counsel's performance and held that the circumstances did not warrant the presumption of prejudice. 466 U.S. at 660–63, 104 S.Ct. 2039. This conclusion was reached even though the government spent four and a half years to prepare its case while appointed counsel, a young lawyer with a real estate practice, only had 25 days of pretrial preparation. *Id.* at 660, 104 S.Ct. 2039. The Supreme Court said that unless the defendant could show "the complete denial of counsel" or that "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing", or other circumstances of similar magnitude, "there is generally no basis for finding a sixth amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 659 n. 26, 104 S.Ct. 2039; *see also Avery v. Alabama*, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940);

*Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *Chambers,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

In *Avery v. Alabama,* counsel was appointed in a capital case with only three days to prepare prior to trial. 308 U.S. at 450, 60 S.Ct. 321. The trial court denied the counsels' request for additional time, even though both counsel submitted affidavits that they had been tied up in other trials during those three days and therefore had essentially no preparation time prior to trial. *Id.* The Supreme Court found that the defendant had not been deprived of effective counsel, noting the conclusion of the state court that counsel performed "intelligently and well." *Id.* The fact-based analysis suggested by the Supreme Court was to determine whether the tardiness of the appointment in fact rendered such appointments "a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given assistance of counsel." *Id.* at 446, 60 S.Ct. 321. Ultimately the Court concluded that the circumstances of that case did not warrant a per se finding of prejudice and that Counsel's actual performance satisfied the Court that the defendant had received effective assistance of counsel. *Id.* at 450, 60 S.Ct. 321.

Similarly, in *Morris v. Slappy,* the Court reversed a court of appeals holding which had concluded that defendant had been denied effective assistance of counsel when counsel was appointed six days prior to trial on a charge of robbery, burglary, and rape. 461 U.S. at 12, 103 S.Ct. 1610 The Court concluded that broad discretion must be granted to the trial courts concerning whether a continuance should be granted to allow appointed counsel more time to prepare, and, under the specific facts of the representation there involved, the Court found no abuse of discretion. *Id.* at 11–12, 103 S.Ct. 1610.

Finally, in *Chambers v. Maroney,* the defendant was represented by one legal aid lawyer during his first trial, which ended in a mistrial. 399 U.S. at 44, 90 S.Ct. 1975. Upon retrial, a second legal aid lawyer appeared to represent petitioner, and that lawyer did not consult with the defendant until just a few minutes before the second trial began. The defendant alleged that his second lawyer did not render competent legal assistance to him. The Supreme Court affirmed the court of appeals, which concluded that the second counsel provided adequate legal representation. In so ruling, the Supreme Court said, "[W]e are not disposed to fashion a per se rule requiring reversal of every conviction following tardy appointment of counsel . . ." *Id.* at 54, 90 S.Ct. 1975.

■ In the instant case, Jiras was appointed on a Wednesday. The jury selection began on the following Monday. This represents a period of 3 business days and 5 calendar days. The record indicates that Jiras had the opportunity to consult with outgoing counsel and submit pretrial motions. Given the Supreme Court case law discussed *supra,* the Court concludes that this period, however brief, does not constitute a per se prejudicial error.

Satisfied that there is no per se error, the Court now considers the surrounding circumstances to determine if the timing of this specific appointment was error. Jiras met twice with Allen, the outgoing attorney, prior to the beginning of the trial. At those meetings, it is acknowledged that they discussed the available evidence and trial strategies. Also, though Allen requested a one-week adjournment, the express purpose of that adjournment was to accommodate his illness. The mere fact that Allen now says that he would have desired a month-long adjournment to pursue different theories does not change the fact that he requested no such adjourn-

ment at the time. (Allen's request for an adjournment was directed solely at addressing his illness and Allen represented that, health permitting, he would be ready to go to trial after a one-week adjournment. *See* Hearing Tr. dated Jan. 16, 1996 at 2.) Even for an experienced criminal attorney like Jiras, the provision of only 3 business days renders defense admittedly difficult. However, the mere timing of the appointment, without more, remains insufficient to rise to a constitutional defect. *See generally Cronic*, at 660–663, 104 S.Ct. 2039. To the extent that the Court will consider this short period, it is best evaluated in light of any specific errors made by counsel at trial that are traceable to the short preparation time. *Id.* at 659 n. 26, 104 S.Ct. 2039. It warrants mention, however, that there is nothing in the record to suggest that, had he possessed more preparation time, Jiras would have proceeded any differently in defending Petitioner.

2. The trial court's failure to grant Allen's request for an adjournment.

■ In *Morris v. Slappy*, the Supreme Court held that broad discretion must be granted to the trial courts concerning whether a continuance should be granted to allow appointed counsel more time to prepare. 461 U.S. at 11, 103 S.Ct. 1610. In fact, "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* at 12, 103 S.Ct. 1610 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)). Under the specific facts of this case, Judge Weber informed Petitioner that Allen's specific health situation could significantly delay the disposition of the case. After being informed of that potential delay and being asked whether Allen should be relieved, Petitioner said "OK, your Honor. How long will this next lawyer have to familiarize him-

self?" Judge Weber informed Petitioner that "the [evidentiary] hearings have been done," that there was additional time to prepare the substantive case during jury selection and that "[a] lot of the preliminary work has already been done by Mr. Allen." In light of those circumstances, Judge Weber indicated that an attorney would not require a "long time" to prepare. As such, Judge Weber suggested that they start the trial "next week, but I will have the guy work on it today or tomorrow for sure." After that information was conveyed, Petitioner did not object to substituting Jiras for Allen.

Magistrate Judge Boyle is of the view that this decision by the trial court represented an unreasoning and arbitrary insistence on rushing to trial. In support, Judge Boyle cites *Norde v. Keane*, 294 F.3d 401 (2d Cir.2002), for the proposition that a trial court's denial of defense counsel's request for an adjournment to consult with her client during jury selection is an unreasoning and arbitrary denial. However the circumstances in that case are distinguishable from Petitioner's situation. In *Norde*, the defendant was forcibly removed from the courtroom during jury selection. *Id.* at 414. At that point, defense counsel requested an adjournment to consult with the defendant. *Id.* The request was denied. *Id.* From that point on, the defendant was required to communicate to counsel through a bailiff. *Id.* It was that physical separation of the client from counsel during the critical voir dire proceeding that rendered the court's denial of an adjournment unreasonable and arbitrary. *Id.* In the instant case, Petitioner was never absent from a critical proceeding or denied direct access to counsel by the refusal of an adjournment. In any event, this Court declines to adopt the portion of the Report that indicates that

the trial court's denial of an adjournment was of constitutional significance.

3. Trial counsel's failure to perform a reasonable investigation.

■■■ "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Magistrate Judge Boyle identified three errors that he felt demonstrated Jiras' failure to conduct a reasonable investigation. This Court will address one, viz., Jiras' failure to obtain expert witnesses. On November 29, 1995, over a year before Jiras was appointed, the prosecution obtained Dr. Gordon's report detailing the observed condition of the alleged victim's hymen. In the intervening year, Allen made no effort to retain an expert. However, on the third day of jury selection, Jiras made two ex parte motions for leave to employ a child psychologist/psychiatrist and a medical doctor, respectively. These motions were granted by the court.

There is no evidence that Jiras ever retained the services of either type of expert. He assuredly did not present such expert testimony at trial. Therefore, Jiras had the opportunity and actually considered utilizing defense experts. Nonetheless, Jiras ultimately failed to utilize the experts that he had considered. *See* Report at 48–49 ("The court's search of the record did not reveal that Jiras submitted an affidavit for payment (3) for an expert psychologist/psychiatrist retained by the defense" or for a "medical doctor" retained by the defense).

In *Pavel v. Hollins,* 261 F.3d 210 (2d Cir.2001), the failure to investigate the medical claims that formed the physical evidence for sexual abuse charges was unreasonable and formed the basis for constitutionally defective assistance of counsel. 261 F.3d at 225. Much like in the instant case, in *Pavel* the complaining witness testified against the petitioner but the only testimony regarding physical evidence of abuse was derived from experts. *Id.* at 213–215. In the instant case, Jiras did cross-examine the expert. Dr. Gordon's testimony stated that the perceived injury to Chanel's hymen was triangular in shape and that it appeared to have been distorted via insertion of an object. Jiras cross-examined Dr. Gordon on whether masturbation could have caused this trauma. Dr. Gordon testified that masturbation could not cause the trauma but expressly stated that he could not say what type of foreign object caused what he perceived to be a misshapen hymen.

This cross-examination does not cure the error of failing to seek a competing expert opinion. As stated by the Report, Dr. Gordon's methodology and conclusions regarding (1) the perceived damage to Chanel's hymen and (2) his explanation that evidence of trauma in the anal region would not be present unless there was a "reoccurrence of anal sodomy at least a dozen times within six months" were problematic.[5] *See* Report at 37–39.

"[T]here is no indication in the record that [Jiras] had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable informed determination as to whether an expert should be consulted or called to the stand." *Pavel,* 261 F.3d at 225. Despite this lack of education and knowledge, Jiras consulted no experts pri-

---

**5.** Indeed, Dr. Jocelyn Brown, a well-credentialed physician, described the latter conclusion—in a Section 2254 hearing before Judge Boyle—as "false" and the product of Doctor Gordon "making it up as he goes along." Report at 38.

or to his cross-examination and sought to introduce no competing expert testimony.

The Second Circuit has stated that a reasonably competent attorney, when she notes an inconsistency in the medical testimony proffered by the prosecution in a sexual abuse case, "would have consulted and been prepared to call an expert to drive this disparity home." *Id.* at 224–225. In the instant case, the inconsistency was found in the fact that the Dr. Gordon could not rule out other causes for the supposed, and apparently questionable, injury to hymen. Neither could Dr. Gordon find any injury to the anus. Here,

> the only witnesses to the alleged abuse were its victims and the defendant, and there was no substantial circumstantial evidence of abuse. When a sex abuse case boils down to such a "credibility contest," physical evidence will often be important. Indeed, "many" sex abuse cases are "close ... on the evidence," *Swofford v. Dobucki*, 137 F.3d 442, 443 (7th Cir.1998), and when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of "neutral, disinterested" testimony that may well tip the scales and sway the fact-finder. *Williams[ v. Washington],* 59 F.3d [673,] 682 [ (7th Cir.1995) ] ("In a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important.").

*Id.* at 224.

In light of these statements by the Second Circuit, the Court concludes that, in the instant circumstances, Jiras' decision to not call an expert witness to rebut the prosecution's witness, or at least confer with an expert prior to cross-examination, constituted error and was not related to a valid trial strategy. *See generally id.* at 224 n. 17 (collecting cases and articles that stand for the proposition that an expert

must be called in circumstances similar to the instant case). "In sum, defense counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by Dr. Gordon contributed significantly to his ineffectiveness." *Lindstadt,* 239 F.3d at 202.

4. Trial counsel's "Racial View on Credibility of Complainant."

■ Judge Boyle's Report describes Jiras' argument that "poor illegitimate black children are less credible than middle class white children" as both "groundless" and "racially offensive." *See* Report at 51, 53. The Court has reviewed the record and certainly agrees with that description. However, in my view, it is not quite as constitutionally suspect as characterized by Judge Boyle. Jiras' theory, as the Court understands it, was that poor children raised by a single, drug-addicted parent are less likely to tell the truth than a financially comfortable child with a stable homelife. This theory falls within the ambit of trial strategy. However, the examples utilized by Jiras strongly suggest an racial undercurrent to the theory, which warrants further discussion.

Jiras repeatedly compared the alleged victim's situation to that of the "Beaver" from the popular 1950's television show. The alleged victim happens to be of african-american descent while the "Beaver" happens to be white. This point of view is lamentable, but, given that its focal-point was essentially socio-economic, rather than racial in character, it is not fundamentally racist. As such, the theory does not implicate Second Circuit decisions, such as *U.S. ex rel. Haynes v. McKendrick,* 481 F.2d 152 (2d Cir.1973); *McFarland v. Smith,* 611 F.2d 414 (2d Cir.1979), that have decried arguments appealing to racial differences. Pursuant to the reasoning dis-

cussed supra, Jiras' theory, albeit offensive and poorly articulated, does not appear to be beyond the "wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

5. Trial counsel's "Disclosure of Other Acts of Sexual Abuse."

In the opening statement, Jiras revealed that there were allegations of abuse from the Sister. These allegations were not the subject of the proceeding and almost certainly would not have been admissible. Volunteering this information was an error by defense counsel. While this, if viewed in isolation, might be insufficient to establish ineffective assistance of counsel, *see United States v. Bari*, 750 F.2d 1169, 1182 (2d Cir.1984); *Smithwick v. Walker*, 758 F.Supp. 178, 182–183 (S.D.N.Y.1991), the error does provide evidence of the inadequate representation provided to Petitioner. The Court will consider this error in conjunction with all other alleged errors to determine the ineffective assistance of counsel claim.

6. Trial counsel's failure to offer proof on the "failure to marry defense."

The problem in the instant case does not involve a theory that was actually pursued at trial. Rather, the Court is faced with a conspiracy defense that was delineated in the opening but never again mentioned by Jiras.

■ " 'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.' " *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986)). Actions or omissions by counsel that " 'might be considered sound trial strategy' " do not constitute ineffective assistance, *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel*

*v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)), and a court "may not use hindsight to second guess" counsel's tactical choices, *see Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

■ A petitioner may rebut the suggestion that the challenged conduct reflected merely a strategic choice by showing that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo*, 13 F.3d at 533. In the instant case, the alternative theory was that these allegations formed part of a conspiracy to force Petitioner into marriage. This theory is not clearly and significantly stronger than the theory that Jiras pursued at trial, viz., (1) Petitioner was a man with past legal difficulties but still incapable of this type of crime, (2) Petitioner was not living with at the home in which the alleged was said to occur after May of 1999, and (3) Chanel was a product of a troubled homelife that lead her to concoct several stories. After all, attempted and abandoned theories both revolve around the veracity of Chanel. Given this common ground, the Court is hard-pressed to identify one theory as clearly and significantly stronger than another. As a result, Petitioner has failed to rebut the strong presumption of effective assistance of counsel. *See United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.1997).

Notwithstanding the above, the fact remains that, during his opening, Jiras represented that he would "present evidence" of a conspiracy. He never followed this representation with any evidence during trial or even an explanation for its absence during his closing. The Court will consider this error alongside the other identified errors to evaluate their cumulative effect upon Petitioner's assistance of counsel.

7. Cumulative Effect of the Noted Errors and Resulting Prejudice.

 "Since [Petitioner]'s claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should [also] be reviewed together." *Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991); *see also* Report at 44–45 (citing *Lindstadt,* 239 F.3d at 199); *Strickland,* 466 U.S. at 695–696, 104 S.Ct. 2052. Therefore, "[e]ven if [Petitioner]'s claims, evaluated individually, might not amount to a due process violation sufficient to require habeas relief, nevertheless, given the number of" errors in this case, habeas relief is proper on the basis of the cumulative effect of Jiras' trial errors. *Rodriguez,* 928 F.2d at 538. In the instant case, the Court concludes that, evaluated collectively, informing the jury of the inadmissible accusation as to the Sister and the failure to call, or at least consult, a competing expert combine to render Jiras' assistance constitutionally deficient. The inadequate representation was further aggravated by the failure to pursue, or otherwise explain, the conspiracy defense that was so aggressively advanced during his opening,[6] never to be revisited. Despite the above findings of error, Petitioner must still demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687–88, 104 S.Ct.

2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052. Petitioner adequately makes this showing.

The prosecution's case was reducible to the testimony of the alleged victim and the testimony of Dr. Gordon. If Jiras had sought expert assistance, the defense probably could have neutralized the probative effect of Dr. Gordon's already weak testimony. In this hypothetical situation, only the alleged victim's testimony would remain as part of the prosecution's case. However, Jiras admitted that the Sister had also implicated Petitioner. This admission further bolstered Chanel's allegations. Finally Jiras never followed through on the theory espoused during his opening as the key to Petitioner's defense. Jiras did not even attempt to explain the abandonment of this conspiracy theory to the jury. This failure was emphasized by the prosecution. *See* Trial Tr. at 804 ("The defendant promised you in his opening remarks that you would hear evidence that Debra and her girls made this up as a conspiracy in order to force the defendant to marry Debra, and the defendant asked almost all the People's witnesses: Did you ever hear any arguments about marriage?").

In a close case such as this one, where there was limited physical evidence and the case was reducible to a "credibility contest," these errors take on a special

**6.** Consider the following excerpts from defense counsel's opening statement

> JIRAS: We will present evidence that the mother, indeed formed a conspiracy with her two daughters to falsely accuse the defendant. It will be our evidence. That is not speculation. That is pure evidence coming from our case, which we're entitled to.

Trial Tr. At 31.

> JIRAS: In fact, we are going to present evidence, not speculative evidence—we

are going to present evidence to you, specific evidence to you, that will show the mother even told defendant that if he would marry her, she would have the children drop the charges, or this child drop the charges, because there were two charges brought, not by this one little girl, this little pink dress, but the other sister as well. There were other charges that were attempted to be brought that he did something to her as well.

*Id.* at 32.

importance. With that caveat in mind, the Court concludes that the cumulative effect of Jiras' errors prejudiced Petitioner.

### A. Petitioner's Sentence.

In that Petitioner has established his right to a conditional release, *see* Part II *infra*, the question of whether he was the victim of retaliatory sentence is rendered moot and, thus, will not be addressed.

### B. Insufficiency of the Evidence.

Judge Boyle found that there is sufficient evidence to support Petitioner's conviction. After a thorough review of the Report and the record, this Court agrees with that finding.

### III. Conclusion

Based on de novo review, the Court concludes that Petitioner, due to the cumulative effect of several significant errors by trial counsel, was denied effective assistance of counsel and that the denial was prejudicial. To the extent that the reasoning and conclusions in the Memorandum and Order dovetail with those in the Report—as is true in errors 3, 5 and 6, *see* pg 21, *supra*—the Report is adopted as the decision of this Court for the reasons indicated herein.

In light of the foregoing, the Court orders Petitioner's conditional release. *See Herrera v. Collins*, 506 U.S. 390, 403, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("The typical relief in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner ....."). Accordingly, Respondent is ordered to release Petitioner unless within sixty (60) days of the docketing of this Memorandum and Order, "New York State has, by that point, taken concrete and substantial steps expeditiously to retry [Petitioner]." *Pavel*, 261 F.3d at 229.

**SO ORDERED.**